286 F.2d 896
 Benedict K. GOODMAN, Petitioner,
v.
Ezra Taft BENSON, Secretary of Agriculture of the United States, and Thomas J. Flavin, Judicial Officer, United States Department of Agriculture, Respondents.
 No. 12920.
 United States Court of Appeals Seventh Circuit.
 February 16, 1961.
 
 Homer E. Rosenberg, Chicago, Ill., for petitioner.
 Samuel D. Slade, Atty., Dept. of Justice, Washington, D. C., Donald A. Campbell, Atty., Dept. of Agriculture, Washington, D. C., for respondents.
 George Cochran Doub, Asst. Atty. Gen., Morton Hollander, Chief, Appellate Section, U. S. Dept. of Justice, Washington, D. C., Neil Brooks, Asst. Gen. Counsel, Dept. of Agriculture, Washington, D. C., for respondents.
 Before DUFFY and KNOCH, Circuit Judges, and PLATT, District Judge.
 DUFFY, Circuit Judge.
 
 
 1
 The petitioner seeks to review and set aside an order of the Judicial Officer of the United States Department of Agriculture,[1] ordering all contract markets to refuse all trading privileges to the petitioner for a period of 20 days because of violations of the Commodity Exchange Act (7 U.S.C.A. §§ 1-17a) and the regulations pursuant to the Act. The order has been stayed pending determination of this appeal.
 
 
 2
 The Judicial Officer found that during the period from December 1, 1957 through February 21, 1958, petitioner Goodman 1) failed to file reports as to his rye futures contracts as required by the Act and regulations, and 2) held a speculative position in rye futures contracts in excess of 500,000 bushels, the maximum permissible quantity established under the Act.
 
 
 3
 The Commodity Exchange Act previously known as the Grain Futures Act, confers upon the Secretary of Agriculture authority to regulate boards of trade, futures commission merchants, floor brokers and persons trading on regulated markets. 7 U.S.C.A. §§ 6-17a. The Act requires all trading in futures in commodities specified in the Act to be conducted upon designated markets.
 
 
 4
 The Commodity Exchange Commission, acting under authority of the Act, issued a regulation effective December 3, 1945, providing that the speculative "limit on the maximum net long or net short position which any person may hold or control in rye on or subject to the rules of any one contract market is 500,000 bushels in any one future or in all futures combined."[2] 17 C.F.R. § 150.3(a).
 
 
 5
 Regulations issued by the Secretary set forth the procedure to be followed in filing reports as to futures transactions and positions. Regulations applicable to persons trading in rye futures contracts provide that reports must be filed by every person who holds or controls open contracts in any one future on any one contract market which equal or exceed 200,000 bushels. No signature was required on these reports, but they each bore a code number which had been assigned by the Commodity Exchange Authority (C EA).
 
 
 6
 Petitioner is and has been engaged in the real estate business in the city of Evanston, Illinois. However, since 1927, he has been a member of the Chicago Board of Trade, a designated contract market under the Act. At various times he has purchased and sold in substantial volume, contracts involving various grains such as wheat, corn and rye.
 
 
 7
 In August or September, 1957, petitioner decided to buy some rye futures contracts on the Chicago Board of Trade. He inquired of one of his brokers as to the maximum permissible number of bushels of rye futures contracts he could lawfully buy. The broker told him the ceiling or limit was 2,000,000 bushels. This broker testified that after he had informed petitioner that the limit was 2,000,000 bushels on all commodities, he was not definitely sure that he had given the correct information, so he called the Commodity Exchange Authority and someone there, whose name he could not recall, told him the limit was 2,000,000 bushels. The broker further testified that on the same day or the following day, he called petitioner and informed him that the information he had given to him was correct.
 
 
 8
 At his office, sometime in September, 1957, petitioner told his secretary that he was allowed to buy 2,000,000 bushels of rye futures contracts; that she should keep track of petitioner's purchases of rye futures and inform the petitioner when the total purchases approached the 2,000,000 bushel limit.
 
 
 9
 Petitioner proceeded to accumulate rye futures contracts on the Chicago Board of Trade, and between December 31, 1957 and February 21, 1958, he owned such contracts in amounts ranging from 580,000 to 1,085,000 bushels.
 
 
 10
 Petitioner claims he did not know, prior to February 21, 1958, that his secretary had not been filing the required reports with the CEA. Her explanation was that she had taken the information given to her by petitioner in September, 1957 to mean that no reports were necessary until petitioner had acquired 2,000,000 bushels of rye futures. However, the evidence showed petitioner's secretary had filed reports for petitioner for many years including reports on rye. Also, during the period here under consideration, she filed reports as to certain other commodities when petitioner's position reached 200,000 bushels.
 
 
 11
 On February 21, 1958, on a visit to the Chicago Board of Trade, petitioner learned that investigators had been checking into his rye accounts at seven brokerage houses through which he did business. He claims he was again informed at this time by representatives or employees of brokerage houses, that the limit on rye was 2,000,000 bushels. Petitioner was not satisfied with this information, and directed his attorney to make an investigation. On February 23, petitioner was informed by his attorney that the limit on rye was 500,000 bushels. On February 24, 1958, he sold all rye futures contracts in excess of 500,000 bushels.
 
 
 12
 Petitioner claims he acted in good faith and had a right to rely on the information given to him by his broker. He argues there is no evidence and findings which are a proper basis to demand a forced sale of his grain assets, and that the Secretary's order as to him amounts to cruel, unusual and unconstitutional punishment. He also attacks the constitutionality of the applicable sections of the Commodity Exchange Act.
 
 
 13
 Shortly after December 3, 1945, when the Commodity Exchange Commission reduced the limit on the maximum speculative position in rye for future delivery which any person could hold or control on any one contract market, the Chicago Board of Trade addressed a letter to its members, setting forth in full the order of the Commission. Petitioner was a member of the Board of Trade at that time. The 500,000 bushel limit for rye has remained in force continuously since December 3, 1945.
 
 
 14
 During the period February 23 through March 2, 1956, petitioner held a speculative position in rye futures on the Chicago Board of Trade in excess of 500,000 bushels. When his attention was called to this matter by the Commodity Exchange Authority, petitioner explained he did not know the limit had been reduced to 500,000 bushels. Within a day or two, petitioner brought himself into compliance. As a result of this occurrence, petitioner received from the Chicago office of the CEA, a document specifying the speculative limits on trading and positions under the Act which stated the maximum allowable position in rye was 500,000 bushels. Shortly thereafter, petitioner received a letter from the Administrator of the CEA in Washington, D. C. containing similar information, and stating, "We are sure that we can depend upon your cooperation in the future to see that there is no recurrence of trading or holding of positions in excess of the permissible limit." At that time, no complaint was filed and no sanctions were imposed upon petitioner.
 
 
 15
 It was less than eighteen months later that petitioner again commenced dealing in rye futures. Apparently he did not refer to the documentary material previously supplied to him. He did not communicate directly with the regulatory agency which had admonished him in 1956. He made inquiry only of a partner of a brokerage firm that dealt primarily in securities, and only on a relatively small scale, in commodity futures.
 
 
 16
 It is undoubtedly true that trading in rye is small compared with other commodities such as wheat. Also, it does make for some confusion that the limits as to other grains were 2,000,000 bushels. Nevertheless, petitioner makes no showing as to why he thought there was any change in the limit as to rye futures which had been in effect since 1945. Apparently the rebuke he received in 1956 for exceeding 500,000 bushels in rye made very little impression upon him. The Judicial Officer found "Respondent's (petitioner here) behavior does not impress us as that of a reasonable man attempting to comply with the requirements of law, especially in view of his prior experience and the information he had previously acquired with respect to the trading limit in rye futures." The Judicial Officer also found, "A similar lack of care is present in respondent's (petitioner) failure to comply with the reporting requirements of the act and the regulations issued thereunder."
 
 
 17
 The scope of our judicial review, under the Commodity Exchange Act, is to ascertain "* * * whether the finder of the fact was justified, i. e., acted reasonably, in concluding that the evidence, including the demeanor of the witnesses, the reasonable inferences drawn therefrom and other pertinent circumstances, supported his findings." Great Western Food Distributors, Inc. v. Brannan, 7 Cir., 201 F.2d 476, 479-480.
 
 
 18
 We hold the record supports the findings of the hearing examiner and the judicial officer that petitioner had ample reason to know the correct limit as to rye futures, and was not attempting, in good faith, to comply with the regulatory requirements. The question of the credibility of petitioner's testimony was for the hearing examiner. It was also the hearing examiner and the judicial officer who were entitled to draw the inference that petitioner was not attempting, in good faith, to comply with the requirements.
 
 
 19
 The responsibility for making the reports was on the petitioner. Admittedly, he made no effort to determine whether the reports were being filed. It is immaterial whether a mistake was made by the secretary. The fact is, the reports were not made, and it was the responsibility of the petitioner that the regulations be carried out.
 
 
 20
 Petitioner urges his denial of trading privileges amounted to a suspension of a license, and that section 9(b) of the Administrative Procedure Act, 5 U.S.C.A. § 1008(b), was violated. We do not reach that question for the same section excludes cases of wilfulness. We hold the petitioner's conduct was wilful within the meaning of section 9(b) of the Administrative Procedure Act. We think it clear that if a person 1) intentionally does an act which is prohibited, — irrespective of evil motive or reliance on erroneous advice, or 2) acts with careless disregard of statutory requirements, the violation is wilful. Eastern Produce Co. v. Benson, 3 Cir., 278 F.2d 606, 609.
 
 
 21
 Petitioner argues the Secretary of Agriculture should be estopped because an employee of the CEA gave incorrect information to a broker who, in turn, relayed that information to petitioner. However, we agree, with the holding in Nichols & Co. v. Secretary of Agriculture, 1 Cir., 131 F.2d 651, 659, that an unauthorized act or interpretation by an employee of the Commodity Exchange Authority does not estop the government from bringing a disciplinary action under the Commodity Exchange Act. Furthermore, this Court, in Bowles v. Lentin, 7 Cir., 151 F.2d 615, 618, a case involving ceiling price regulations, held that the "* * * Administrator cannot be bound by oral interpretations of his employees which are contrary to official published regulations."
 
 
 22
 Petitioner's arguments as to the unconstitutionality of the Commodity Exchange Act, the applicable regulations and the sanctions imposed, cannot be sustained. The validity of the Grain Futures Act was sustained in Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839. The validity of the Commodity Exchange Act was sustained by this Court in Moore v. Chicago Mercantile Exchange, 7 Cir., 90 F.2d 735, certiorari denied 302 U.S. 710, 58 S.Ct. 30, 82 L.Ed. 548; Nelson v. Secretary of Agriculture, 7 Cir., 133 F.2d 453, and United States v. Grady, 7 Cir., 225 F.2d 410, 412-415, certiorari denied 350 U.S. 896, 76 S.Ct. 155, 100 L.Ed. 788.
 
 
 23
 Petitioner insists the sanctions imposed are harsh and unwarranted. Surely the suspension of trade for 20 days was not excessive. The complainant had suggested a suspension period of 90 days. The principal objection seems to be the requirement that petitioner liquidate all existing positions.
 
 
 24
 The administrative decision as to the remedy should be sustained unless the remedy selected has no reasonable relation to the unlawful practices found to exist. G. H. Miller & Co. v. United States, 7 Cir., 260 F.2d 286, 295-297. Our decision in Miller was followed in Eastern Produce Co. v. Benson, 3 Cir., 278 F.2d 606, 610. The court there said, at page 610, that since the administrative "order is well within the allowable choice of remedy, we have no right to change the penalty because the agency might have imposed a different one."
 
 
 25
 The petition to review and set aside the order of the Secretary of Agriculture issued October 12, 1959 is
 
 
 26
 Denied.
 
 
 
 Notes:
 
 
 [1]
 The Judicial Officer acted for the Secretary of Agriculture pursuant to authority delegated to the Judicial Officer. 10 Fed. Reg. 13769; 11 Fed.Reg. 177A-233; 18 Fed.Reg. 3219, 3648; 19 Fed.Reg. 74
 
 
 [2]
 Since the speculative limits for grain were first promulgated in 1938, they have been amended only once, viz., in 1945, when the rye limit was reduced from 2,000,000 to 500,000 bushels