**NORTH STATE TELEPHONE COM-
PANY, INC., Appellant,**

v.

**ALASKA PUBLIC UTILITIES COMMIS-
SION, Atlantic Richfield Com-
pany et al., Appellees.**

No. 1838.

Supreme Court of Alaska.

May 3, 1974.

Theodore R. Dunn of Matthews, Dunn & Baily, Anchorage, for appellant.

John Reeder, B. Richard Edwards, Asst. Attys. Gen., Anchorage, and John E. Havelock, Atty. Gen., Juneau, for appellee Alaska Public Utilities Commission.

John R. Scott of Holland, Thornton & Scott, Anchorage, for appellee-intervenors Atlantic Richfield Co. and Mobil Oil Corp.

Theodore E. Fleischer of Ely, Guess & Rudd, Anchorage, for appellee-intervenor BP Alaska, Inc.

Eugene F. Wiles of Delaney, Wiles, Moore, Hayes & Reitman, Anchorage, for appellee-intervenor Standard Oil Co. of Cal.

Before RABINOWITZ, C. J., and CONNOR and ERWIN, JJ.

## OPINION

CONNOR, Justice.

■ This case arises from the decision of the Alaska Public Utilities Commission to relieve North State Telephone Company, Inc., of the authority to provide public telephone exchange service to the Prudhoe Bay area of the North Slope region of Alaska. This authority was originally granted by a Commission order of May 12, 1969, which amended North State's existing certificate of public convenience and necessity. It was granted after a consolidated hearing on three competitive applications submitted by North State, Kenai Utilities Service Corporation, and Communications Equipment and Service Company. North State previously held and still holds authority to provide exchange service in Dillingham, King Salmon-Naknek, and Kotzebue. The amendment giving North State the additional authority was granted on condition that North State have installed and operational within one year of the date of the order an exchange telephone system that would satisfy substantially all of the known demand for service in the area covered by the amendment. Paragraph 2 of the order provided

"2. If North State Telephone Co., Inc. is not providing to the Commission's satisfaction substantially all the known requirements for telephone exchange services in the areas described in (1) above by the end of one year from the date of this order, the amendment of certificate granted herein shall be null and void."

After North State experienced certain difficulties in implementing service, it was allowed on May 12, 1970, at its request, an additional three-month period in which to comply with Paragraph (2) of the order. The order had also required North State to

make periodic reports on its progress in providing service. On July 24, 1970, the Public Utilities Commission issued an "order to show cause" as to why the "North Slope Certificate" should not be nullified. The order to show cause was based on a review of North State's periodic filings which indicated that "North State is at this time providing what may at best be described as only minimal service in its service area". The order read in pertinent part:

"THE COMMISSION ORDERS:

(1) North State Telephone Company, Inc. shall show cause at a hearing to be held before the Commission . . . on August 7, 1970 at 9:30 a. m., why its Certificate of Public Convenience and Necessity for the North Slope should not be nullified and voided for failure to satisfy the conditions specified in paragraph (2) of the Order Granting Certificate herein.

(2) This order is without prejudice to the authority of the Commission to consider revocation of the subject certificate at a later time for reasons specified in AS 42.05.271 or for such other lawful cause as may be shown to exist." [1]

Various oil companies, now intervenors in this appeal, were granted by order the right to participate in this hearing as interested parties. The hearing was held on August 7, 1970. North State, the Alaska Public Utilities Commission, and the oil companies presented evidence as to present and future communication needs on the North Slope, and North State's efforts to satisfy those needs. On November 3, 1970, the Commission issued a forty-page order nullifying the certificate, stripping North

State of its authority to provide service to the North Slope. After discussing the facts on which it based its findings and conclusion, the Commission found

"1. North State has wilfully failed to comply with Ordering Paragraph (2) of the Order Granting Certificate

2. North State has not presented sufficient excuse to be relieved from failure to comply with Ordering Paragraph (2) of the Order Granting Certificate

3. North State's performance under regulation has not been of a quality sufficient to warrant relief from its failure to comply with Ordering Paragraph (2) of the Order Granting Certificate

4. Nullification of the authority granted North State in the Order Granting Certificate is not inconsistent with the public interest."

Thus, the Commission ordered that North State's authority to provide service to the North Slope was ". . . null and void for failure to satisfy the conditions contained in paragraph (2) of said order". This decision was appealed to the superior court, and the oil companies were granted the right to intervene. After briefing, the court entered findings and ultimately a judgment affirming the decision of the Commission. From this judgment North State appeals.

North State alleges the following errors: (1) that the notice for the show cause hearing was inadequate, and deprived it of its rights to fair notice and hearing, (2) that the burden of proof was improperly placed on North State, and (3) that the action of the Commission was arbitrary and not supported by substantial evidence.

---

1. The Commission correctly concluded that the order was not self-executing and that a hearing on the issue of compliance was necessary before the authority to operate could be terminated. A similar conclusion has been reached with regard to construction permits for radio and TV stations by the FCC under 47 U.S.C.A. § 319(b). See MG-TV Broadcasting Co. v. FCC, 133 U.S.App. D.C. 54, 408 F.2d 1257, 1261 (1968); Mass Communicators, Inc. v. FCC, 105 U.S.App. D.C. 277, 266 F.2d 681, 684 (1959).

## ADEQUACY OF NOTICE

North State maintains that there was a prejudicial discrepancy between the evidence it was prepared to meet, under the terms of the order to show cause, and the evidence actually presented at the hearing. In other words, what should have been a hearing narrow in scope became a hearing much broader in scope. Prepared to present evidence on the narrow issue of fulfillment of the condition in its certificate, North State contends that at the actual hearing it was confronted with evidence on several other possible grounds for revocation of its certificate. It is contended that the hearing thus became a full decertification hearing.

We agree with the proposition espoused by North State and expressed in Morgan v. United States, 304 U.S. 1, 18–19, 58 S. Ct. 773, 776, 82 L.Ed. 1129, 1132–1133 (1938):

> "The right to a hearing embraces not only the right to present evidence, but also a reasonable opportunity to know the claims of the opposing party and to meet them. The right to submit argument implies that opportunity; otherwise the right may be but a barren one. Those who are brought into contest with the Government in a quasi judicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command."

The facts of the *Morgan* case are somewhat more startling than those of the case at bar, since the decision maker had conferred *ex parte* with the government before adopting its claims, and had given the opposing party no opportunity to specifically refute them. But the case is relevant. In this appeal, North State maintains that most of the evidence introduced at the hearing went to the issue of lack of any need for service in the exchange area rather than North State's failure to satisfy known needs. Thus, it argues that the real basis of the decision was "public conven-

ience and necessity" which was a point it was not prepared to meet in the hearing.

▮ Although there are cases that go both ways on the issue, the modern trend in administrative pleading is to require simply that the parties be sufficiently apprised of the nature of the proceedings so that there is no unfair surprise. K. Davis, Administrative Law § 8.04 and § 8.05 (1958). Moreover, since the basic element to be satisfied is the opportunity to prepare one's case, the actual content of the notice is not dispositive. The question is whether the complaining party had sufficient notice and information to understand the nature of the proceedings. That is, unlike a formal complaint in a civil action, defects in adminstrative notice may be cured by other evidence that the parties knew what the proceedings would entail. K. Davis, *supra,* at p. 525, and cases cited therein.

The testimony by witnesses called by the oil companies concerned North State's technical ability to provide service, as well as the lack of need for North State's service. North State claims that this evidence was irrelevant, and that its admission converted the proceeding into an inquiry about the decertification of North State, raising issues which North State was not prepared to meet.

▮ In our view the evidence had some relevancy in establishing the known requirements in the area, which in turn would bear upon whether North State was meeting those requirements. North State's technical ability was also relevant to the question of whether it was substantially providing service to known needs, which was part of the conditions on which its certificate had been granted. Since there was sufficient evidence showing a failure to meet known needs, we regard the admission of the evidence complained of as harmless.

▮ We do not think that the testimony which was objected to fatally tainted the proceeding or that the proceeding was converted into one outside the scope of the notice. We are reinforced in this view by

several additional factors. First, North State's president, John Gilbert, admitted in his testimony that there were known needs for service which were not being served by North State;

"Q. [By Mr. Cole]  Is it your testimony today, Mr. Gilbert, or was it your testimony yesterday that there is now no need, or hasn't been, for the past fifteen months, any need for a wireline service . . .

A. (Interrupting)  No.

Q. (Continuing)  . . .  except for Hamilton Brothers.

A. That was not my testimony.

Q. Is that your testimony today?

A. No, it is not.

Q. Is there a need for a wireline service today?

A. There is.

Q. Has there been a need for a wireline service in the past fifteen months?

A. There was.

Q. Other than Hamilton Brothers?

A. Yes.

Q. And you're not, and have not, for the past fifteen months, provided any wireline service, except to Hamilton Brothers?

A. That is correct."

There was also testimony by Gilbert about the requirements and needs of the FAA, Wagley and Wien Consolidated Airlines; and he admitted that they were not then being served. He also admitted that the single customer North State was serving, Hamilton Brothers, had one location that was not being served, and that the FAA had applied for service.

Second, this proceeding was not entirely original. The Commission, by its order of May 12, 1969, had retained jurisdiction to inquire later as to whether North State was providing adequate service within one year. North State had been on notice from the time of certification that the adequacy of its service would be reviewed by the Commission after one year elapsed. The show cause order can be viewed merely as the final step in a continuing administrative process, with which North State was already familiar.

We conclude that, in the circumstances of this case, the notice was adequate to apprise North State of the nature of the case it would have to meet. We find no error.

## BURDEN OF PROOF

North State maintains that the Commission erroneously placed the burden of proof on it by (1) improperly proceeding by an order to show cause, and (2) by defining "wilful" in AS 42.05.271, listing "wilful" violation of a condition of a certificate as "good cause" for revocation, so as to place the burden on North State.

This court has held in *Dimmick v. Watts*, 490 P.2d 483 (Alaska 1971), that without express authorization in the civil rules, a superior court may not proceed by way of an order to show cause. That case might be applied by analogy to this one before the Alaska Public Utilities Commission. The *Dimmick* case also recognized that the nature of the order in that case was to merely shorten the time necessary before proceeding further with the case. It has also been recognized that the basic question where an improper order to show cause is entered is whether the party had adequate notice of the nature of the proceedings.

"The fundamental point is not the name given to the pleading, but whether appellant was apprised of the charge against it. We hold that the show cause order was sufficiently comprehensive to acquaint appellant with the nature of the proceedings. . . ." State v. Abel, 10 Wash.2d 349, 116 P.2d 522, 524–525 (1941).

Since there is no indication in the instant case that the effect of the order was to shorten the time before the hearing and the order to show cause gave North State adequate notice, we deem the order harmless error.

Moreover, the chairman of the Commission stated at the outset of the hearing:

"The Commission's opening case will be presented by Mr. Louis Agi, Assistant Attorney General and legal counsel for Alaska Public Utilities Commission. To the extent of any contested factual issues that will develop in this hearing, the *burden* will be on the Commission to establish its contentions unless otherwise indicated." [Emphasis added]

To us the real issue is who, in fact, had the burden, not the nature of the order to show cause.

As to what constitutes "good cause" to revoke a certificate, the Alaska Public Utilities Commission Act provides in AS 42.05.271

". . . . Good cause for amendment, modification, suspension or revocation of a certificate includes. . . .

(4) wilful failure to comply with the provision of this chapter or the rules, regulations or orders of the commission;

(5) wilful failure to comply with a term, condition, or limitation of the certificate."

The Commission found North State in wilful violation of the conditions of the certificate under the following definition:

"These circumstances also establish the basis for a finding that the failure was "wilful" under AS 42.05.271(4) and (5), which the commission *construes as requiring only a showing that the failure to comply was with knowledge of the consequences of such failure.* [Emphasis added]

North State argues that by adopting this construction, a "presumption of wilfullness" was established merely by a showing that there was a failure and knowledge that sanctions would follow. Thus, it maintains that "the burden of attempting to justify its conduct was then shifted to the utility."

North State also buttresses this by various references to the Commission's discussion of the failure to show such justification.

"The Commission is of the opinion that North State *has not demonstrated* a quality of management and performance under regulations sufficient to overcome its responsibility for failure to provide service as required under the Order Granting Certificate. [Emphasis added]. *North State has not presented* sufficient excuse to be released from failure to comply with ordering paragraph (2) of the Order Granting Certificate. [Emphasis added]

Any failure by North State to introduce evidence of immediate and substantial exchange need may be properly considered against it at this point."

North State neglects to state, however, that the Commission's definition of "wilful" was followed by a statement that the Commission would waive noncompliance if there were "sufficient excuse for non-compliance" and that "an excuse will be acceptable if based on factors beyond the control or responsibility of the party seeking relief". The Commission went on to add that such discretionary determinations as to "control" or "responsibility" were to be made in "accordance with the standard of conduct expected of a reasonably prudent businessman under similar conditions", the "quality of performance under regulation", and the "public interest". And the three quotations cited by North State merely refer to the fact that North State had failed in its attempt to "demonstrate" or "present" evidence on the issues, not that it carried the ultimate burden of doing so.

Thus, the Commission was not saying that North State suffered the burden of showing justification but was simply stating what it would consider as a justification so as to make the failure "excusable". In this regard, it seems to have been well within the accepted meaning of "wilful" in interpreting administrative statutes. The term itself is not a "word of art" or a "technical term". It has many different

meanings, depending upon the context in which it is used. In Spies v. United States, 317 U.S. 492, 497–498, 63 S.Ct. 364, 367, 87 L.Ed. 418, 422 (1943), the U. S. Supreme Court stated:

"Willful, as we have said, is a word of many meanings, its construction often being influenced by its context."

In Goodman v. Benson, 286 F.2d 896, 900 (7th Cir. 1961), the court stated:

"We think it clear that if a person (1) intentionally does an act which is prohibited,—irrespective of evil motive or reliance on erroneous advice, or (2) *acts with careless disregard* of statutory requirements, the violation is wilful."

In holding that the actions of petitioner in violating the Commodities Exchange Act by failing to file some required reports and holding a speculative position in futures in excess of a prescribed maximum were "wilful", and thus deserved sanction by the Department of Agriculture, the *Goodman* court rejected petitioner's argument that he did not know the reports had not been filed and that he had incorrect information from a broker. The court went on to say:

"The *responsibility* for making the reports was on the petitioner. Admittedly, he made no effort to determine whether the reports were being filed. It is immaterial whether a mistake was made by the secretary. The fact is, the reports were not made, and it was the *responsibility of the petitioner* that the regulations be carried out." [Emphasis added]

A similar definition of "wilful failure" was adopted in Union Transfer Co. v. Beeline Motor Freight, 150 Neb. 280, 34 N.W.2d 363 (1948), in holding that a carrier's failure to provide service to a certain route over three years was "wilful failure" even though the carrier maintained that it was owing to a lack of personnel, equipment and business.

"The word 'willful' like many other words in our language has varied meanings which are dependent upon the nature of the subject under discussion. The word often denotes an act which is voluntary, knowingly or permissively done as distinguished from one which is accidental or otherwise beyond the control of the person to be charged. The general notion that a willful act implies a bad purpose is derived from criminal statutes. It has no such meaning when used in a statute to denounce an act not in itself wrong. 'Willful failure' as used in Section 75–238, R.S.1943, is such behavior through acts of commission *or omission* which justifies a belief that there was an intent entering into and characterizing the failure complained of. *A failure to perform an act for a long period of time, which is required by law to be performed, generally constitutes a willful failure to perform.* . . . The willful failure or refusal of a carrier to obtain permission from the railway commission to discontinue in whole or in part the service authorized under a certificate of convenience and necessity constitutes sufficient grounds to suspend, change, or revoke the certificate under general rules adopted by the railway commission." [Emphasis added]

At the outset of the hearing, the Commission clearly stated that the burden of proof was to be on it. Contrary to North State's contention, the Commission's definition of "wilful" in finding that there was a "wilful failure" to meet the condition in the certificate, i. e., "good cause", did not shift the burden of justification to North State. The concept of wilfulness, i. e., failure to meet responsibility and exercise control, which was utilized by the Commission is in accordance with case law. Goodman v. Benson, *supra*; Union Transfer Co. v. Beeline Motor Freight, *supra*. Rather than stating that North State had the duty of proving justification for the failure, the Commission was merely delineating the nature of what would be reasonable justification, so as to render a failure to meet the condition non-wilful and, thus, the nature of the case that had to be made out by the evidence. We find no error.

## ADEQUACY OF THE FINDINGS

North State attacks the adequacy of the findings made by the Commission. Appellees contend that North State abandoned this branch of the appeal during the process of review by the superior court. From our review of the record it is not clear whether North State did abandon its contentions. We will, therefore, treat the issues raised by North State.

■■ We agree with North State that findings by an administrative tribunal serve a number of salutary purposes. Proper findings assure that cases are decided upon the evidence before the tribunal and not upon arbitrary or extralegal bases. Findings also permit a reviewing court to discern whether the case has been determined in accordance with applicable legal rules and standards. Mobil Oil Corporation v. Local Boundary Commission, 518 P.2d 92 (Alaska 1974); K & L Distributors, Inc. v. Murkowski, 486 P.2d 351 (Alaska 1971); Saginaw Broadcasting Co. v. Federal Communications Commission, 68 App.D.C. 282, 96 F.2d 554 (1938). But it is not necessary that the findings of the agency be cast in a particularly formalistic mold. It is enough if the basic facts underlying decision are stated by the administrative tribunal in such a manner that it can be determined on review that the ultimate facts were permissibly inferable from the basic facts.

■ In the case before us, 37 pages of the Commission's order are devoted to explaining why it believed that North State's certificate should be nullified. In this connection, numerous references are made to the data and testimony adduced before the Commission.

We have already, earlier in this opinion, disposed of the adequacy of the finding of North State's wilful failure to provide service. We need not discuss that question further.

North State contends that the findings are deficient in other respects. The Commission in its order concluded that North State, after receiving the amendment to its certificate of May 12, 1969, had not conducted its affairs, in attempting to provide service, as a reasonably prudent businessman would have done under the circumstances. The Commission referred to delays by North State in securing a physical site for its operations, and delays stemming from the processing of an application to the Federal Communications Commission for authority to operate a microwave station. It concluded that a reasonably prudent businessman would not have undertaken a project of this type without having first taken steps to assure that a physical site was available for conducting its operations. Similarly, the Commission concluded that a reasonably prudent businessman would have envisaged that a proceeding before the Federal Communications Commission might take a considerable period of time. He would not, therefore, have embarked upon the project without having some assurance as to the time necessary to secure authority from that federal agency.

North State complains that the Commission reached these conclusions without evidence as to how reasonably prudent businessmen would have conducted, or did conduct, themselves in an area such as the North Slope of Alaska during the years in question. In our view it was not necessary for the Commission to receive or consider such evidence in order to reach its determination. The Commission was employing a general standard of conduct, and was measuring the conduct of North State against that standard. As to whether North State met that standard the Commission could employ its general knowledge of how reasonably prudent businessmen conduct their affairs. It was not necessary to make detailed findings of fact as to what the standard should be. The matter was one committed to the sound discretion of the Commission. Our review of the record reveals no abuse of that discretion.

Affirmed.

BOOCHEVER and FITZGERALD, JJ., not participating.