APPALACHIAN POWER COMPANY,
Duquesne Light Company and Ohio
Power Company, Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

No. 72–1733.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 10, 1977.

Decided June 13, 1978.

See also, 4 Cir., 477 F.2d 495.

H. Edward Dunkelberger, Jr., Washington, D. C. (Theodore L. Garrett, and Covington & Burling, Washington, D. C., on brief), for petitioners.

Bethami Auerbach, Atty., Environmental Protection Agency, Washington, D. C. (James W. Moorman, Acting Asst. Atty. Gen., Edmund B. Clark and Neil T. Proto, Attys., Dept. of Justice, Jerome Ostrov, Deputy Associate Gen. Counsel of Air, Noise and Solid Waste Division, Washington, D. C., on brief), for respondent.

Before RUSSELL, Circuit Judge, and FIELD, Senior Circuit Judge, and WIDENER, Circuit Judge.

DONALD RUSSELL, Circuit Judge:

Following our decision in *Appalachian Power Co. v. Environmental Pro. Agcy.* (4th Cir. 1973) 477 F.2d 495, in which the factual background of this proceeding is set forth, the parties agreed upon a remand order providing for reconsideration by the respondent Environmental Protection Agency

(EPA) of its earlier approval of the West Virginia State Implementation Plan, prepared and submitted by the State in compliance with the Clean Air Act, 42 U.S.C. § 1857 et seq. In that order the petitioners, electric utilities, agreed to specify, in a submission to the EPA, "those provisions of the West Virginia Plan for Implementation of the Ambient Air Quality Standards (the West Virginia Plan), as approved by Order of EPA dated May 31, 1972 to which Petitioners have any objection at the present time" along with "a statement of facts upon which Petitioners base their objection to each such provision." The EPA in turn agreed, in connection with such objections, to "complete its review of the entire record, as supplemented by the Petitioners' written (and oral) submissions" and to "propose [publish] its findings [with respect thereto] in the Federal Register accompanying any action that it takes * * * [with] a technical support document." The petitioners were given 30 days after publication of the proposed findings to comment thereon. The EPA's final findings were to be published in the Federal Register within 45 days thereafter and were to be prefaced by an introductory statement of "all pertinent comments received by EPA during the 30-day comment period." Within 15 days after final EPA action, the petitioners were to "advise the Court as to whether they intend[ed] to pursue their petition for review." There was also a reservation of decision on the right of the petitioners, in the event of the final approval of the state plan, to contest enforcement proceedings "on the grounds of high cost benefit, technological infeasibility and resource unavailability." In summary, the purport of this stipulation was that, without prejudice to petitioners' original Petition for Review and without threat in the meantime of an enforcement action, the petitioners were to

specify with particularity their objections to the approval of the state plan by the EPA under the Clean Air Act, and the EPA was to review the petitioners' particularized objections to the state plan and, on the basis of its evaluation of those objections, either to affirm or to withdraw its earlier approval of the state plan.

The petitioners submitted their particularized objections to the state plan as required under the agreed remand. These objections were directed at Regulations II and X of the state plan and related basically to the emission limits for particulates and sulphur dioxide. They were grounded largely on the claims either that the requirements were "unduly restrictive"[1] or that they were economically or technologically impractical.[2] In submitting such objections, the petitioners assumed, as did this Court in its earlier opinion, that these were issues which the EPA, in its determination to approve or disapprove the state plan, was itself required to review and evaluate. After the filing of the objections with their supporting factual data, conferences were had between the petitioners and the EPA, and proposed findings by the EPA followed.

The proposed findings of the Administrator on the petitioners' objections were published on March 4, 1976 and notice of the availability of the supporting technical data was noticed on May 13, 1976, triggering the sixty-day public comment period which was to follow. These findings related both to the economic and technological feasibility and to the alleged over-stringency of the state plan. However, on June 25, 1976, and after the proposed findings had been published, *Union Electric Co. v. EPA*, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474, was decided. Contrary to our holding in 477 F.2d 495, the Court in that case held that the EPA, in determining whether to ap-

---

1. In specifying their objections, the petitioners stated that "Regulations II and X of the West Virginia implementation plan are more stringent than necessary for attainment of the standards and are thus contrary to the policy and goals of the Act."

2. In their objections, the petitioners posit that "the West Virginia control strategy reflects a failure to develop emission limitations in accordance with sound scientific procedure formulated to achieve necessary air quality goals" and that the plan's "unnecessarily stringent, technologically infeasible particulate limits" are invalid under the Act.

prove or disapprove a proposed state plan, was not to consider objections based on economic or technological feasibility, or claims that the plan was more stringent than necessary to attain and maintain national ambient standards, since these were issues committed exclusively to state review and evaluation. On September 28, 1976, EPA published its final decision, along with its responses to the comments raised by the petitioners. Because of the *Union Electric* decision, it concluded that any further consideration of the objections relating to over-stringency or technological and economic feasibility were foreclosed,[3] and it proceeded in this final decision to reaffirm the approval of the state plan. In early December of 1976 the EPA, on this state of the record on remand, moved to dismiss the Petition for Review and the petitioners countered with their motion to remand. These motions—one by the EPA to dismiss and the other by the petitioners to remand—present the issues now before the Court.

*Union Electric* clearly barred any objections to approval of the state plan by the EPA on grounds either of greater stringency in the requirements than demanded by the national primary ambient standards or of want of economic or technological feasibility. The EPA accordingly argues that, since the Remand Order, as agreed to by the parties and as approved by this court, limited the petitioners in their objections to the approval of the state plan to the matters specified in their objections as filed pursuant to that remand order, and since such objection related to the two areas found by *Union Electric* not to be available as grounds for disapproval by the EPA of a state plan, no valid objections by the petitioners to the approval of the state plan remained for disposition by this Court and dismissal of the Petition was in order. This argument would, however, disregard the fact that, first, before approving a state plan, the EPA must determine that the state plan was adopted at the state level "after reasonable notice and public hearings," as provided for in § 1857c–5(a), 42 U.S.C.[4] and, second, that the petitioners did assail in their original Petition for Review the constitutional adequacy of compliance by the State Agency with that requirement. We do not agree that the petitioners, either by the agreed Remand Order or by the objections filed by them pursuant to that Remand Order, abandoned this ground of complaint. It, however, does represent the only basis on which the petitioners can resist the EPA's Motion to Dismiss, since their other objections are indisputably foreclosed by *Union Electric.*

It cannot be maintained—nor do we understand the petitioners to contend—that there was not "reasonable notice and public hearings" prior to the promulgation by the State of the two regulations (II and X) of the state plan, about which the petitioners complain. There were, in fact, three public state hearings relevant to petitioners' claims, held after public notice. The first of these hearings was classified as a preliminary hearing, directed to a consideration particularly of Regulation II of the proposed state plan. It was held on November 18, 1971. The second preliminary hearing covered particularly Regulation X of the state plan and was held on December 15, 1971. The petitioners participated in both of these hearings. They were specifically advised at each hearing that any interested party might file written comments on the proposed regulations within 30 days after the hearing. This was in accordance with West Virginia law.[5] Later, on January 13, 1972, a public hearing, after reasonable notice, was held on the proposed implementation plan as a whole. Prior to that hearing,

---

**3.** See *West Penn Power Co. v. Train* (3d Cir. 1976) 538 F.2d 1020.

**4.** See, *Indiana & Mich. Elec. Co. v. Environmental Pro. Agcy.* (7th Cir. 1975) 509 F.2d 839, 847:

"* * * Prior to the formulation of a state plan, full public hearings are required under Section 110(a), and where a proposed plan has been formulated without public hearings, it may not be approved by the Administrator."

**5.** § 16–20–5, Code of West Virginia.

copies of the proposed final plan were distributed about the State of West Virginia. It is not seriously argued that the proposed final plan was not available to petitioners in ample time prior to the public hearing to allow them to acquaint themselves with its contents. The petitioners were, also, present at this hearing. After the hearing on the plan as a whole, any interested party was given four additional days to file any additional comments he might wish to register. It is manifest, then, that there were public hearings on the state plan as a whole and on the two regulations challenged by the petitioners and that such hearings were reasonably noticed.

■ It is the position of the petitioners, though, that the hearings were constitutionally flawed and should have been declared invalid by the EPA. They identify broadly three fundamental errors in the hearings, which in their view undermined the validity of the state proceedings. First, they assert that at the November 18 hearing on Regulation II the director of the State Air Pollution Control Commission suggested for the first time the inclusion in the regulation of a stack gas monitoring requirement. Such belated introduction of a fundamental change in the proposed regulation at the hearing itself afforded them, they contend, no reasonable opportunity to comment thereon. This, in their view, voided the hearing. This suggestion of the director, however, was not incorporated in the final plan as adopted by the State Agency and, if there were any error in the proposal of the director, that error was erased and rendered moot by the failure of the State Agency finally to adopt it.

■■ The petitioners raise a similar objection to the proceedings of December 15, 1971. The State director again suggested at this hearing some amendments in the

proposed Regulation X. A number of these related simply to a change in effective dates, a change incidentally favorable to the petitioners. The other amendments were more substantive. They dealt with emission standards for fuel burning units and the conditioning of stack gas. The amendment with reference to emission standards was not formally adopted; in fact, the ultimate language of the proposed Regulation was more burdensome on the petitioners than that proposed by the Director.[6] Any merit in the objection to these standards is rendered academic, however, by the later changes and amendments in Regulation X, changes made after notice and hearing, in conformity with the requirements of the Act. Actually, we are told without contradiction that Regulation X is presently undergoing a complete revision at the state level and that hearings are in progress in connection with such proposed revision. The petitioners have had and will hereafter have full opportunity to present their views and to make their comments in connection with this revision and to pursue a judicial review of the Commission's action, if petitioners conclude that the final action of the Commission on such revision is erroneous. Similarly, the regulation relative to conditioning of stack gas has in fact, we are told, again without contradiction, been reviewed in a later hearing, after notice in 1974, and a new regulation has been adopted. It is true that the petitioners seem to regard this new regulation as too stringent and as imposing an unnecessary burden on them but these are matters for the State Commission and not for the EPA or for us under *Union Electric*.[7]

■ Next, the petitioners would fault the state proceedings for failure to provide them in advance of the hearings with the necessary information and data on which the proposed plan was predicated, asserting

---

6. The final regulation need not conform to the form of notice as presented, so long as the changed language does not depart from the "original scheme" of the regulation. *South Terminal Corp. v. Environmental Protection Agcy.* (1st Cir. 1974) 504 F.2d 646, 658–9.

7. In *Train v. Natural Resources Def. Council* (1975) 421 U.S. 60, 79, 95 S.Ct. 1470, 1482, 43 L.Ed.2d 731, the Court said EPA had "no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of 110(a)(2) * * *."

that, without such data, they could not adequately comment on the plan or challenge its bases in a meaningful hearing. This contention poses initially the questions of the type of hearing to which the plan was to be subjected, and the rights to be accorded parties in connection with such hearing. There seems no real controversy that the proceedings before the State Agency were properly to be controlled by the rules applicable to what is generally referred to as informal rule-making and were not adjudicatory.[8] All the cases in which issues similar to those here have arisen, have so treated the state proceedings. And this would seem to accord with the rule adopted and followed in *United States v. Florida East Coast R. Co.* (1973) 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223. In that case, the Court found that only where the statute authorizing the administrative proceeding mandated a "hearing *on the record* " was an adjudicatory, as distinguished from a rule-making, hearing required.[9] The statute control-

ling the state proceedings here required only "public hearings" "after reasonable notice," [10] and accordingly fell within the category of what is normally described as an informal rule-making procedure.[11]

■■■■ "Reasonable notice" in advance of public hearings commanded by the statute and the right to comment, however, contemplate that the nature of the proposed action be sufficiently identified and described to permit meaningful comment on the proposed action.[12] The Petitioners contend that such notice, identifying the nature of the proposed action, had to include, or make provision for the availability in advance of hearing of all the data supporting the proposed rule or regulation, in order to satisfy constitutional standards.[13] If this means that the most minute details of the supporting material must be made available, we think the objection of the petitioners may go too far. Constitutional require-

---

8. *See* our former opinion at pp. 500–1, 477 F.2d; Note, *Judicial Review of the Facts in Informal Rulemaking: A Proposed Standard*, 84 Yale L. J. 1750, 1751, n. 5 (1975); *Hoffman-La Roche, Inc. v. Kleindienst* (3d Cir. 1973) 478 F.2d 1, 12–27.

 Of course, the proceeding involved in this challenge was before a state agency and was not controlled by the Administrative Procedure Act, 5 U.S.C., § 553. However, petitioners' challenge rests apparently on due process grounds and the requirements of due process are satisfied if the provisions of the APA are complied with. *American Public Gas Ass'n v. Federal Power Com'n*, (D.C.Cir. 1977) 567 F.2d 1016, 1067. *See, also*, Rodgers, *Environmental Law*, 233–4 (1977):

 "* * * The Clean Air Act extends no right to an adjudicatory hearing, and most states treat preparation of the plans as involving legislative-type decisions where affected parties may appear and present statements but not participate further through cross-examination and submission of questions, unless a particular need is shown."

9. 410 U.S. at 236, 237, 93 S.Ct. 810 (emphasis added).

10. 1857c–5(a), 42 U.S.C.

11. *See, Union Oil Co. of California v. Federal Power Com'n* (9th Cir. 1976) 542 F.2d 1036, 1040 and *Indiana & Mich. Elec. Co. v. Environmental Pro. Agcy.* (7th Cir. 1975) 509 F.2d 839, 846.

12. In *National Asphalt Pavement Ass'n v. Train* (1976) 176 U.S.App.D.C. 296, 539 F.2d 775, 779, n. 2, the Court said:

 "* * * in order to have a 'meaningful' opportunity to comment, one must be aware of the information the agency finally decides to rely on in taking agency action."

13. For this position, the petitioners rely on the language in *Portland Cement Association v. Ruckelshaus* (1973) 158 U.S.App.D.C. 308, 486 F.2d 375 at 393, *cert. denied* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399, *reh. den.* 423 U.S. 1092, 96 S.Ct. 889, 47 L.Ed.2d 104:

 "* * * It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data, or on data that, [to a] critical degree, is known only to the agency."

 *See, also, Home Box Office, Inc. v. F.C.C.* (D.C.Cir. 1977) 567 F.2d 9, 35–6:

 "* * * the notice required by the APA, or information subsequently supplied to the public, must disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based. * * *

 * * * * * *

 "* * * an agency proposing informal rule-making has an obligation to make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible."

ments it would seem, would be satisfied if the agency, by notice of other information made available reasonably in advance of hearing, apprises parties of the nature and basis of the regulation or rule sufficiently to enable them to understand and identify the material issues relating to the justification for the regulation or rule so that they can comment thereon intelligently. In fact, there is authority to the effect that, since the proceeding is unlike a formal complaint in a court proceeding, any defect in the notice or its supporting material, may be covered by other evidence that the parties knew what the regulation, if adopted, would entail and were thus able to comment meaningfully on the regulation.[14]

Actually, though, the EPA, contrary to the position of the petitioners, asserts that the petitioners had available to them prior to the final hearing on the state plan ample information to enable them to comment intelligently on the proposed plan; specifically, it claims that the petitioners had available to them before the final state hearing all the data on which the State Agency proposed to act and which they now claim was not then available to them. EPA supports this claim with the affidavit of the Chairman of the State Agency. In this affidavit, the Chairman affirms that such data was made available before the final hearing at convenient points throughout the State of West Virginia and that representatives of utility and business interests did review such data before that final hearing. The petitioners were following all the proceedings before the State Agency closely. They were represented at all the hearings and it is to be assumed they were reviewing with the officials of that agency the various provisions of the state plan, including this supporting data. It is significant that they have filed no counter-affidavits from any of the persons representing them in the state hearings or in conferences with the agency that this data was not available to them.[15] In particular, there is no contention that they requested any information from the State Agency with reference to the basis of any provision of the state plan. It is true that in their brief they do make reference to some complaints voiced at the hearings. These complaints, though, were not made by the petitioners and primarily they related to proposed regulations which were never adopted. In short, the record as a whole suggests strongly that the petitioners were sufficiently advised of the scope and basis of the state plan and its regulations to enable them to comment intelligently and meaningfully on the proposed plan and its basis. *See South Terminal Corp. v. Environmental Protection Agcy., supra,* 504 F.2d at 659–60. No more was required.

■ Moreover, in their attack on the state plan before the EPA in 1974, the petitioners demonstrated quite clearly that they understood the basis and knew the data on which the state plan was formulated and they proceeded, in their statement of objections, to identify the erroneous assumptions and calculations on which they urged the state plan was predicated. It must be assumed that they derived this

---

14. Schwartz, *Administrative Law Cases during 1974,* 27 *Ad.L.Rev.* 113, 126; *Sterling Drug, Inc. v. Weinberger* (2d Cir. 1974) 503 F.2d 675, 683; *North Star Tel. Co. v. Public Uts. Com'n* (Alaska 1974) 522 P.2d 711, 714.

15. The nearest the petitioners come to any attempt at refutation of the agency Chairman's affidavit is an affidavit from its expert who stated that in 1974 he was unable to find such data in the files of the State Agency. However, the petitioners must have acquired access at some point to this data or they could not have prepared the objections they filed with the EPA in 1974 and this access should necessarily have been either from the hearings before the State Agency or from the state plan filed with the EPA. The affidavit of the Chairman of the State Agency would include this material in the file submitted in 1972 to the EPA as constituting the record of proceedings before the State Agency. We have no reason to question this statement. Certainly, if the material were not available in advance of the State hearing, we repeat that it would have been a simple matter for the petitioners to have had one of their representatives who followed the proceedings at the state level to contradict the Chairman's affidavit. In the absence of any such contradiction, we are unwilling to conclude that the statements in the affidavit are false.

information from the record of the state proceedings, either as shown by the files of the State Agency or of the EPA. Specifically they took the position in their objections that the emission standards as established in the plan for their plants were "unnecessarily stringent" and were based on the "worst-case approach," as applied in too few regions.[16] But in developing these points, the petitioners did not argue that the State Agency had not provided the data or assumptions on which its regulations were rested. It was their contention that the agency's data and assumptions were inaccurate rather than that the data was unavailable. It is unnecessary for us to pass on the validity of their objections to the assumptions made from the data on which they relied; it is sufficient for purposes of our review that the petitioners demonstrated indisputably their understanding of the agency's methodology, basis and data used in formulating its plan and of what the regulations in the proposed plan, if adopted, provided, so far as their operations were concerned. As we have said, the affidavit of the Chairman of the State Agency, which the petitioners did not directly contradict, is to the effect that all the data providing this information was available to the petitioners before the January, 1972 hearing. Even if we accept the petitioners' view that the State Agency was obligated to provide the public with the data on which its regulations were predicated before public hearing, the obligation, according to the Chairman's affidavit was satisfied.

 The petitioners find, also, a deficiency in the state procedures because of the absence in the final plan of an explanation of "the basis for the requirements in the plan" or of a response "to the comments made by affected persons." But there is no obligation in rule-making proceedings to make reference in the final action "to all the specific issues raised in comments," *Kennecott Copper Corp. v. Environmental Protection Agcy.* (1972), 149 U.S.App.D.C. 231, 235, 462 F.2d 846, 850, *Consumers U. Of U. S., Inc. v. Consumer Product Safety Com'n* (2d Cir. 1974) 491 F.2d 810, 812, *cf. Home Box Office, Inc. v. F. C. C., supra,* 567 F.2d at 36, or to make findings of fact in support of the final action taken, so long as the rationale of the agency's action " 'may reasonably be discerned,' " *Ethyl Corp. v. Environmental Protection Agcy.* (1976), 176 U.S.App.D.C. 373, 406, at 445, 541 F.2d 1, 34, at 73, *cert. denied* 426 U.S. 941, 96 S.Ct. 2662, 2663, 49 L.Ed.2d 394, 406, at 445. No exhaustive statement of reasons for the rule is required; what is required is "a concise general statement of [the regulation's] basis and purpose." *United States v. Allegheny-Ludlum Steel* (1972), 406 U.S. 742, 758, 92 S.Ct. 1941, 1951, 32 L.Ed.2d 453. The State Agency satisfied this requirement in its final plan.[17]

 We have proceeded so far on the assumption that the petitioners have standing to by-pass available state remedies and assert these alleged defects in the state hearings either before the EPA or in this Court. This poses a serious question. Admittedly, there was a well-defined procedure provided by state law whereby the petitioners could have raised these alleged procedural defects by instituting a declaratory judgment action in a state court.[18] Such a procedure would have provided an expeditious means for determining whether the state proceedings were flawed, and, if so, would have provided a means for correcting those flaws at the state level without all the delays involved in later appeals to the EPA and to this Court. The petitioners chose, however, to bypass this available

---

16. § 1857c–2(a), 42 U.S.C. provides:

"Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State."

17. *See, also, Renegotiation Board v. Grumman Aircraft* (1975) 421 U.S. 168, 191–2, 95 S.Ct. 1491, 44 L.Ed.2d 57.

18. § 29A–4–2, West Virginia Code.

state remedy. We find persuasive the reasoning that the petitioners, by bypassing the state remedy for correction of any defect in the state proceeding, lack standing to challenge any alleged errors in those State Agency proceedings later before the EPA or this Court. *Cf. Anaconda Company v. Ruckelshaus* (10th Cir. 1973) 482 F.2d 1301, 1304. It is unnecessary, however, for us so to conclude in this case, since we have discovered no defects in the state proceedings.

■■■ In addition to the claims asserted in their original Petition for Review and in their objections filed after the entry of the stipulated remand following our earlier decision, the petitioners have raised two other issues. One of these is addressed to the failure of the EPA to consider and discuss the petitioners' objections to the state plan's visible emission (opacity) standard. Passing over whether this is not an objection foreclosed by *Union Electric*, it manifestly comes too late. The remand order was plain: The petitioners were obligated to state all their substantive objections under the Act to EPA's approval of the state plan. In so doing, the petitioners did not specify this objection when they identified their objections under the terms of the remand order. It was only after EPA had filed its proposed findings that the petitioners for the first time raised this claim. The EPA refused to consider the claim under these circumstances and its action was clearly justified under the agreed terms of the remand order.[19]

Subsequent to the filing of the Petition for Review in this proceeding, Congress enacted the Energy Supply and Environmental Coordination Act of 1974, (ESECA) Pub.L. 93–319, 88 Stat. 246. Under that Act the EPA is authorized to review state implementation plans such as that involved here and to "notify the [interested] [s]tate if [its] restrictions on fuel-burning stationary sources may be relaxed without inter-

fering with timely attainment and maintenance of national air quality standards." § 1857c–5(a)(3)(B), 42 U.S.C. (1970 ed., Supp. IV); *Union Electric v. EPA, supra,* 427 U.S. at 263, n. 10, 96 S.Ct. 2518 [at 2528]. The EPA has reviewed the West Virginia plan under the provisions of that Act and supplied the West Virginia Commission with its findings. It is the petitioners' contention that the EPA cannot approve the state plan until it has in turn reviewed the plan in the light of and in compliance with the EPA's report under the Act.

■■■ This argument gives to the ESECA report a far greater significance and effect than Congress intended. Such report will not operate to compel an amendment of a state implementation plan nor will it impose any duty on a state to modify in any particular its plan. That is clear under the Act and the point was emphasized in *Union Electric, supra,* where the Court, in discussing this very statute, said that, "[t]he decision whether to relax restrictions, [in the state plan as a result of the ESECA report], however, is left to the States. The Act shows congressional awareness and approval of the fact that federally approved implementation plans may be stricter than necessary for attainment of national standards."[20] This language of the Supreme Court makes plain that the ESECA report is simply intended to provide the State with technological information, which it may accept or reject at its discretion in any reconsideration of its state plan. Whether the state accepts or rejects the ESECA report and amends or reaffirms its state plan as a result of the report, provides no basis for either an approval or a disapproval of a state implementation plan by the EPA. If it did, the whole purport of *Union Electric* itself would be nullified, for, under those circumstances, EPA would be passing on the technological and economic feasibility of the

19. That opacity performance standards are appropriately included in a state implementation plan under the Clean Air Act, *see National Asphalt Pavement Ass'n v. Train, supra,* 176 U.S.App.D.C. at 308, 539 F.2d at 787.

20. 427 U.S. at 263, n. 10, 96 S.Ct. at 2528.

plan, the very thing *Union Electric* said EPA could not do. In effect, what the petitioners are asking of us is that we review the ESECA report itself under the guise of reviewing the state plan itself. There is no provision in the Act for such review nor does the report have that finality essential to judicial review. In short, so far as this proceeding is concerned, the ESECA is entirely irrelevant and can offer no warrant for a remand.

To conclude, we find no merit in the petitioners' motion to remand or to their objections to the motion of EPA to dismiss the petition for review. Accordingly the motion to dismiss is granted.

WIDENER, Circuit Judge, concurring:

I concur in most of the opinion of the panel and in the result, but in certain respects I respectfully differ with its reasoning.

I

So far as challenges are made to Regulations II and X, I would hold the complaints are moot.

Those parts of Regulations II and X we are asked to review are those which were imposed in January 1972 following hearings in November and December 1971. But a new complete Regulation II was reimposed effective September 1, 1974 which "supersede[d]" the prior regulation. Section 11 of the 1974 regulation is specific on this point. The same action was taken with respect to Regulation X effective July 30, 1973. Section 10 of the 1973 regulation is similarly clear and is phrased in like language. This alone makes the question moot without considering even later action of the Governor of West Virginia with respect to Regulation X.

Because no defect in the imposition of Regulation II (1974) and Regulation X (1973) is called to our attention, the presumption of regularity attending official acts should apply, see *FCC v. Schreiber*, 381 U.S. 279, 296, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965), with the result that the question is moot because the new regulations have superseded the regulations complained of.

*Wagner Electric Corp. v. Volpe*, 466 F.2d 1013 (3d Cir. 1972), I do not think is authority not to hold this controversy moot, although it is on point for the proposition that the opportunity to petition for amendment or repeal does not take the place of notice and hearing. In the case before us the regulations complained of have been superseded.

II

I do not agree that we should accept Beard's affidavit at face value without mentioning the affidavit of one Kramer filed by Appalachian. But taking both affidavits at face value I think shows the discrepancy in information available to Appalachian was not so great as to go to the constitutional heart of the regulations, rather only to the judgment of the West Virginia Commission in imposing regulations claimed to be too severe, a subject precluded from our consideration by *Union Electric*.

III

I think the complaints made at the 1971 hearings referred to by the panel should be considered to have been made by Appalachian, but, considering such to be the case, I would come to no different result.