NATIONAL ASPHALT PAVEMENT AS-SOCIATION, a Maryland not-for-profit Corporation, Petitioner,

v.

Russell E. TRAIN, Administrator, Environmental Protection Agency, Respondent.

WARREN BROTHERS COMPANY, a Division of Ashland Oil, Inc.

and

Ashland Oil Inc., Petitioner,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

Nos. 74–1332, 74–1388.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 22, 1975.

Decided July 21, 1976.

776

T. Neal Combs, Washington, D.C., with whom George D. Webster and William I. Althen, Washington, D.C., were on the brief, for petitioner in No. 74–1332.

Theodore L. Garrett, Washington, D.C., with whom H. Edward Dunkelberger, Jr. and John P. Rupp, Washington D.C., were on the brief, for petitioner in No. 74–1388.

William L. Want, Atty., Dept. of Justice, Jeffrey O. Cerar, Atty., E.P.A., Washington, D.C., of the bar of the Court of Appeals of New York, pro hac vice by special leave of court, with whom Wallace H. Johnson, Asst. Atty. Gen., Robert V. Zener, Gen. Counsel, E.P.A., Edmund B. Clark, Martin Green and James R. Walpole, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.

Before McGOWAN and MacKINNON, Circuit Judges, and JAMES B. McMILLAN,* United States District Judge for the Western District of North Carolina.

* Sitting by designation pursuant to Title 28, U.S. Code, Section 292(d).

Opinion for the Court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

Section 111 of the Clean Air Act, 42 U.S.C. § 1857c–6 (1970 and Supp. IV, 1974), directs the Administrator of the Environmental Protection Agency (EPA) to maintain a list of stationary sources which "may contribute significantly to air pollution which causes or contributes to the endangerment of public health or welfare." *Id.* § 1857c–6(b)(1)(A) (1970). Within 120 days after the Administrator designates a particular source category as a "significant contributor," he must publish proposed standards of performance for sources within that category. The statute defines a standard of performance as:

> [A] standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction) the Administrator determines has been adequately demonstrated.

*Id.* § 1857c–6(a)(1). The Administrator must afford interested parties an opportunity to comment on the proposed standards, and, after considering such comments and making appropriate modifications, he must promulgate final standards within 90 days after publication of the proposed standards. *Id.* § 1857c–6(b)(1)(B) (Supp. IV, 1974).

On June 11, 1973 the Administrator published a notice in the Federal Register indicating that he had amended his list of "significant contributors" to include asphalt concrete plants. 38 Fed.Reg. 15380. On that same day he also published proposed standards of performance for new or modified asphalt concrete plants. *Id.* at 15406. After considering written comments on the proposed standards, the Administrator published final standards of performance on March 8, 1974. 39 Fed.Reg. 9307.

The National Asphalt Pavement Association (NAPA) and various asphalt concrete plants then invoked our exclusive review jurisdiction, 42 U.S.C. § 1857h–5(b)(1)

(Supp. IV, 1974), filing a petition in this court challenging the action of the Administrator on the following grounds: (1) the Administrator failed to provide interested parties with a meaningful opportunity to comment on the designation of the asphalt concrete industry as a "significant contributor"; (2) the Administrator erred in determining that asphalt concrete plants are "significant contributors" within the meaning of the Act;[1] and (3) there is insufficient evidence in the record (a) to support the Administrator's conclusion that the standards of performance are achievable through the best systems of emission reduction and (b) to show that the Administrator took attendant costs into account. For the

reasons set forth below, we affirm the action of the Administrator.

I

 Petitioners first argue that they were never given a meaningful opportunity to comment on the Administrator's designation of the asphalt concrete industry as a "significant contributor" within the meaning of the Clean Air Act.[2] The thrust of petitioners' complaint appears to be that in simultaneously publishing the "significant contributor" designation *and* proposed standards of performance, the Administrator indicated that he had already reached a final determination on the "significant con-

1. The Government contends that the judicial review provision of the Clean Air Act, *supra*, provides for review of final standards but not for review of the action of the Administrator designating a source category as a "significant contributor." Brief at 7. We disagree. Section 307(b)(1) of the Act, specifically provides for judicial review of "action of the Administrator in promulgating . . . any standard of performance under [section 111] . . . ." 42 U.S.C. § 1857h–5(b)(1) (Supp. IV, 1974). The preliminary action of the Administrator in listing a particular source category is action taken in the course of promulgating final standards. *See NRDC v. Train*, 171 U.S.App.D.C. 151, 519 F.2d 287, 290–91 (1975) (construing the almost identical judicial review provision of the Federal Water Pollution Control Act Amendments).

2. The Government argues that the designation of an industry as a "significant contributor" need not be preceded by a hearing or opportunity for written comments. Brief at 12–14. To the extent that the Government's brief suggests that an opportunity to comment on the "significant contributor" designation is not required at all before promulgation of final standards of performance, we disagree. Section 111 of the Clean Air Act specifically requires the Administrator to "afford interested persons an opportunity for written comment on such proposed regulations." 42 U.S.C. § 1857c–6(b)(1)(B) (Supp. IV, 1974). And since the Administrator can propose regulations only for a source category on his list of "significant contributors," we think the Clean Air Act requires an opportunity for comment on the designation issue. Moreover, we agree with petitioner Warren Brothers that the "significant contributor" designation is "an integral and pivotal part of the rulemaking process under Section 111," Brief at 25, and that as a result section 4 of the APA requires that interested persons have a meaningful opportunity to comment on *that part of*

*the rule. See* 5 U.S.C. § 551(4) (1970) (definition of rule); *id.* § 553.

We agree with the Government that the Administrator is not required to publish his "significant contributor" designation in proposed form and then hold a separate informal rulemaking proceeding on that specific issue. Neither the Clean Air Act nor the APA requires that an agency hold two separate rulemaking proceedings as to different parts of one rule. Thus, the EPA can continue to have one informal rulemaking proceeding as long as that proceeding considers both the "significant contributor" designation and the proposed standards. Indeed, in rulemaking proceedings such as this one, where the data underlying the "significant contributor" designation is likely to overlap substantially with that underlying the proposed standards, the most sensible course for an agency is to have one proceeding directed at both issues.

The Government also contends that to the extent that notice and an opportunity for comment are required, petitioners have no ground for complaint in that they were "fully aware that the Administrator was considering establishing standards for asphalt concrete plants well before the list was published" and "discussed matters relating to the Administrator's designation" with EPA personnel. Brief at 13. We decline to hold that these pre-designation opportunities for comment satisfied the requirements of either section 111 of the Clean Air Act or section 4 of the APA; in order to have a "meaningful" opportunity to comment, one must be aware of the information the agency finally decides to rely on in taking agency action. *Portland Cement Association v. Ruckelshaus*, 158 U.S.App.D.C. 308, 486 F.2d 375, 393 n. 67 (1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). That data was not known until the designation and background information were made available.

tributor" designation and did not consider it open for discussion during the informal rulemaking procedure. *See* Brief for Warren Brothers at 21 (Simultaneous publication of the designation and the proposed standards "virtually ensured that that determination would be immune from meaningful public comment."). We think an examination of the published notices, the agency's response to written comments, and record correspondence between petitioners and the EPA indicates that the "significant contributor" designation was subject to comment as a threshold question in the rulemaking process, and that petitioners were specifically informed of that fact.

We begin with the notices published in the Federal Register on June 11, 1973. The first notice, published in the "Notices" section of the Federal Register; announced that the Administrator, after considering available information, had determined that the asphalt concrete industry was a "significant contributor" pursuant to section 111 of the Act. The notice also announced that proposed standards of performance were being published that same day. 38 Fed. Reg. 15380.

The second notice, appearing in the "Proposed Rules" section of the Federal Register, announced that "the Administrator proposes herein standards of performance" for new and modified asphalt concrete plants, and that, "[a]s prescribed by section 111, this proposal of standards was preceded by the Administrator's determination that [asphalt concrete plants] contribute significantly to air pollution which causes or contributes to the endangerment of the public health or welfare . . . ." *Id.* at 15406. After stating that interested persons could participate in the informal rulemaking by means of written comments, the Administrator invited comments on "all aspects of the proposed regulations." *Id.* at 15407.

Petitioners point to the language inviting comment on all aspects of *the proposed regulations*, contending that the Administrator indicated that "the substance of the proposed regulations was open for discussion but whether [the Administrator] was

justified in setting such standards in the first place was not." Brief for Warren Brothers at 17. This strikes us as a niggardly interpretation, for one very important aspect of the proposed regulations is whether they comport with section 111's requirement that the source category be a "significant contributor."

Petitioners also point to language in the preamble to the final performance standards, which reads as follows:

"The preamble to the proposed standard . . . urged all interested parties to submit factual data during the comment period to *ensure that the standard for asphalt concrete plants would, upon promulgation*, be consistent with the requirements of section 111 of the Act."

39 Fed.Reg. 9309 (1974) (emphasis added by petitioner Warren Brothers). According to petitioners, this preamble indicates that performance standards of some sort would be promulgated for new and modified asphalt concrete plants, and that the only issue considered by the agency was the nature of the specific limitations. Brief for Warren Brothers at 17–18. But the preamble clearly notes that final standards must be consistent with the provisions of section 111 of the Act, and one of the requirements of that section, as noted above, is that the source category be a "significant contributor."

There is other evidence in the record indicating that petitioners understood the designation issue as open for comment. Petitioner Warren Brothers informs us that it fully supported NAPA's efforts to have the EPA hold a hearing on the "significant contributor" designation, and refers the court to record correspondence between NAPA and EPA concerning that hearing request. The letter to the EPA from counsel for NAPA, dated June 21, 1973 (within the period available for the submission of written comments), states:

It is proffered that the asphalt plants do not contribute significantly to air pollution, thereby causing or contributing to the endangerment of public health or welfare. The data upon which the Envi-

ronmental Protection Agency has relied in making this determination of the significant contribution is based upon old data no longer applicable and the equipment which is presently available results in no significant endangerment of public health or welfare. Consequently, in view of the fact that there is no significant contribution to air pollution, we believe that the Environmental Protection Agency has no authority under the regulations to proceed with the issuance of this standard.

For this reason, it is also suggested that an oral hearing be presented so that every opportunity may be provided for the industry to establish the facts in an oral proceeding subject to cross-examination. Also, we desire the opportunity to cross-examine the appropriate persons within the Agency who have made the determination that there is a significant contribution. It is especially necessary that this be done because, despite the repeated rendition of the facts to the Environmental Protection Agency, such facts have been completely ignored by its staff.

App. at 570. That letter clearly suggests that counsel for NAPA considered the "significant contributor" designation open for comment, and that NAPA desired procedures in addition to those required by section 4 of the APA to probe that issue.

Nothing in the EPA's response to NAPA's letter suggests that the EPA was of the view that the "significant contributor" designation was final and not open for discussion. To the contrary, the EPA's response, though it admittedly denied NAPA's request for an oral hearing on the designation issue, nevertheless "specifically invite[d] the National Asphalt Pavement Association to present to the agency any information or data which it has not already made available" concerning the major area of disagreement over the designation, namely, "the contribution to particu-

late matter air pollution from asphalt concrete plants." App. at 578–79. On July 25, 1973, NAPA submitted its written comments, one of which covered NAPA's contention that "the industry does not contribute significantly to air pollution which causes or contributes to the endangerment of the public health or welfare." App. at 384. *See also id.* (NAPA comments that "the industry attempted to submit data to rebut the proposed finding that it is a significant contributor to air pollution.")

The final piece of record evidence supporting the Government's contention that the "significant contributor" designation was an open issue in the rulemaking is found in the agency's written response to the various written comments. The first listed comment, discussed by twenty-seven commentators,[3] was to the effect that "[t]he asphalt industry is not a 'significant contributor' to air pollution in the United States that endangers or may tend to endanger public health or welfare." App. at 134. The agency responded to the substance of this comment by indicating that it considered all sources of particulate matter to contribute to the endangerment of the public health and welfare, and that it had studied a number of factors—for example, the number of plants and uncontrolled emission rates—and concluded that the asphalt concrete industry was a "significant contributor" of particulate matter air pollution. Although petitioners may dispute the merits of that decision, EPA's response to the comment belies any suggestion that the designation issue was not open to examination during the informal rulemaking.

On the basis of that evidence, we think it is quite clear that (1) the agency considered the "significant contributor" designation to be an issue in the informal rulemaking proceeding, (2) the interested parties were advised of this fact when the agency invited written comments on all aspects of the proposed standards,[4] (3) petitioners indicated

---

**3.** The Government alleges that twenty-nine documents discuss the "significant contributor" designation, but in our view only twenty-seven of the documents can fairly be said to raise that point.

**4.** The agency could have avoided litigation on this issue had it simply published a somewhat more detailed notice inviting public comment. Since the EPA is required to consider comments directed to the "significant contributor"

that they considered the issue open for discussion in requesting a public hearing on the matter, and (4) petitioners were specifically invited by the agency to submit written comments on the issue. As a result, we find no basis for remanding the case to the EPA for further proceedings directed to that issue.

■ Petitioners also attempt to align this case with the decisions in this circuit holding that in some circumstances agencies are required to utilize procedures in addition to those expressly mandated by the Administrative Procedure Act.[5] Petitioner NAPA contends that "more than minimum procedures are necessary when the [agency] is making environmental decisions." Brief at 18, *citing Portland Cement Association v. Ruckelshaus*, 158 U.S.App.D.C. 308, 486 F.2d 375 (1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974), and *Kennecott Copper Corp. v. EPA*, 149 U.S. App.D.C. 231, 462 F.2d 846 (1972). In particular, NAPA suggests that "a public hearing with cross-examination was required" in that the agency was aware "that its test data was disputed" by NAPA and that "[NAPA] contended that [EPA] was not properly considering all factors relating to emission control and that [EPA's] tests were not representative of the nation." Brief at 18. The asphalt concrete compa-

nies suggest that we remand the case for a legislative-type hearing on the "significant contributor" designation because "the crucial nature of the fact-finding underlying this basic determination very strongly supports the argument that the Administrator, as a function of due process, should hold a hearing prior to making his final determination." Brief for Petitioner Warren Brothers at 26 n. 28.

The cases relied on by petitioners do not hold that "hybrid" procedures are required in all informal rulemaking proceedings dealing with environmental issues. To the contrary, those cases suggest instead that "elucidation of certain types of issues, by their very nature, might require particular procedures, including cross-examination." *NRDC v. USNRC*, Nos. 74–1385, 74–1586, D.C.Cir., July 21 (1976), slip opinion at 19. And we have indicated that "the presence of technical issues in and of itself [does not] create a need for cross-examination." *O'Donnell v. Shaffer*, 160 U.S.App.D.C. 266, 491 F.2d 59, 62 (D.C.Cir. 1974). Rather, this court has required that a party challenging agency action make a "proffer of the specific issues and witnesses which they [claim cannot] be explored without [hybrid rulemaking procedures]," *NRDC v. USNRC, supra*, at 17 n. 25, *citing International Harvester Co. v. Ruckelshaus*, 155 U.S.App.D.C. 411, 478 F.2d 615, 630–31

issue sometime during the entire informal rulemaking proceeding, *see* note 2 *supra*, the agency would be well-advised to indicate more clearly in future notices the full coverage of the proceeding.

5. *See, e. g., Portland Cement Association v. Ruckelshaus*, 158 U.S.App.D.C. 308, 486 F.2d 375 (1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); *Mobil Oil Corp. v. FPC*, 157 U.S.App.D.C. 235, 483 F.2d 1238, 1260 (1973); *International Harvester Co. v. Ruckelshaus*, 155 U.S.App.D.C. 411, 478 F.2d 615, 629–31, 649 (1973); *Appalachian Power Co. v. EPA*, 477 F.2d 495, 503 (4th Cir. 1973); *Walter Holm & Co. v. Hardin*, 145 U.S.App. D.C. 347, 449 F.2d 1009, 1016 (1971); *American Airlines, Inc. v. CAB*, 123 U.S.App.D.C. 310, 359 F.2d 624, 632–33 (en banc), *cert. denied*, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). *See generally* Williams, "Hybrid Rule-

making" under the Administrative Procedure Act: A Legal and Empirical Analysis, 42 U.Chi. L.Rev. 401 (1975); Wright, *Court of Appeals Review of Federal Regulatory Agency Rulemaking*, 26 Admin.L.Rev. 199 (1974); Wright, *The Courts and the Rulemaking Process: The Limits of Judicial Review*, 59 Cornell L.Rev. 375 (1974); Verkuil, *Judicial Review of Informal Rulemaking*, 60 Va.L.Rev. 185, 234–49 (1974); Note, *The Judicial Role in Defining Procedural Requirements for Agency Rulemaking*, 87 Harv.L.Rev. 782 (1974); Hamilton, *Procedures for the Adoption of Rules of General Applicability: The Need for Procedural Innovation in Administrative Rulemaking*, 60 Calif.L. Rev. 1276, 1313–30 (1972); Claggett, *Informal Action—Adjudication—Rulemaking: Some Recent Developments in Federal Administrative Law*, 1971 Duke L.J. 51, 78.

(1973), and petitioners in this case have simply failed to make that kind of proffer.

We therefore find no error in the failure of the Administrator to hold a public hearing on the "significant contributor" designation and the proposed standards.

## II

■ The Clean Air Act was designed to reduce existing levels of air pollution, and to that end Congress authorized the Administrator to promulgate national primary and secondary air quality standards for pollutants which have an adverse effect on public health. Clean Air Act §§ 108–09, 42 U.S.C. §§ 1857c–3, 1857c–4 (1970). Pursuant to federally approved state implementation plans, a number of emission control measures have been established to reduce the quantity of pollutants in the air to the level prescribed under the air quality standards.

But the Clean Air Act, and section 111 in particular, was also designed to prevent new pollution problems, especially the deterioration of air quality in areas where existing air quality levels exceed the promulgated air quality standards. The House reported that the provision for control over new stationary sources was enacted to "prevent the occurrence anywhere in the United States of significant new air pollution problems . . . ." H.R.Rep.No.91–1146, 91st Cong., 2d Sess. 3 (1970), U.S.Code Cong. & Admin.News 1970, pp. 5356, 5358. That view was shared by the Senate Committee, which concluded that "[m]aintenance of existing high quality air is assured through provision for maximum control of new major pollution sources." S.Rep.No.91–1196, 91st Cong., 2d Sess. 2 (1970). See 116 Cong. Rec. 32902 (1970) (remarks of Senator Muskie) ("While we clean up existing pollution, we must also guard against new problems. Those areas which have air quality which are better than the national standards should not find their air quality degraded by the construction of new

sources."); id. at 42392 (remarks of Senator Randolph) ("[P]erformance standards for new stationary sources [are designed] to make sure that no industrial development will degrade the quality of the air so as to endanger public health and welfare"). Although the House and Senate versions mandated different methods of federal control over new stationary sources, the Conference Committee eventually recommended what is now section 111(b)(1), which authorizes the Administrator to promulgate standards of performance for new stationary sources which "may contribute significantly to air pollution which causes or contributes to the endangerment of public health or welfare." 42 U.S.C. § 1857c–6(b)(1) (1970 & Supp. IV, 1974).

■ That provision obviously contemplates an evaluation by the Administrator of the risk that certain types of air pollution will "endanger" public health and welfare,[6] and the risk that allowing construction of new stationary sources, even subject to existing state and local regulation, will contribute "significantly" to that air pollution. In our view, the Administrator's evaluation of those risks involves questions which are "particularly prone to uncertainty," and as a result "the statute accords the [Administrator] flexibility to assess [those] risks and make essentially legislative policy judgments . . . ." *Ethyl Corp. v. EPA*, 176 U.S.App.D.C. ——, 541 F.2d 1, 24, 26 (1976), *cert. denied*, —— U.S. ——, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). These policy choices "are not susceptible to the same type of verification or refutation by reference to the record as are some factual questions," *Industrial Union Department, AFL–CIO v. Hodgson*, 162 U.S.App.D.C. 331, 499 F.2d 467, 475 (1974), and consequently are not subject to review with the "substantive rigor proper for questions of fact," *Ethyl Corp. v. EPA, supra*, 541 F.2d 1 at 24. Instead, our "paramount objective is to see whether the agency, given an essentially

---

**6.** For a discussion of the precautionary nature of "endanger" in another environmental context, see *Ethyl Corporation v. EPA*, 176 U.S. App.D.C. ——, 541 F.2d 1 (1976), *cert. denied*, —— U.S. ——, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

legislative task to perform, has carried it out in a manner calculated to negate the dangers of arbitrariness and irrationality in the formulation of rules for general application in the future." *Automotive Parts & Accessories Ass'n, Inc. v. Boyd*, 132 U.S. App.D.C. 200, 407 F.2d 330, 338 (1968).

The Administrator has concluded that "in the case of particulate matter—a pollutant for which national ambient air quality standards have been promulgated— . . . all sources . . . contribute to the endangerment of public health or welfare." App. at 134. Petitioners and various commentators on the "significant contributor" designation do not really challenge the Administrator's conclusion in this regard, and we would be hard pressed to find a reason for overturning this aspect of the Administrator's determination. Particulate matter poses enough of a threat to public health to warrant the promulgation of air quality standards—which are aimed at reducing existing levels of particulate matter—and we have no basis on this record to dispute the Administrator's decision that there is a need to prevent further deterioration of "clean air" by establishing additional national standards of performance for particulate matter.

■ Petitioners' primary attack on the Administrator's designation concerns his conclusion that the asphalt concrete industry contributes "significantly" to particulate matter pollution. The Administrator concluded that it is "meaningless" to develop a firm definition of "significant" contribution to be applied nationwide; as a result of variations in topography, distribution of sources, height from which the pollutant is emitted, and meteorological conditions, a new source may be "significant" in one area and insignificant in another. To achieve the overall objectives of the Act—reduction in existing levels of pollution and prevention of deterioration—the Administrator concluded that construction of new asphalt concrete plants will contribute enough additional particulate matter pollution to warrant regulation as a significant contributor. That determination is based on the Admin-

istrator's examination of the rate of emissions of particulate matter from uncontrolled plants, the stringency of existing state and local regulations limiting emissions from these plants, the number of existing plants, and the expected rate of growth in the number of plants. *See, e. g.,* App. at 38–39, 134.

Petitioners argue that, in determining whether the asphalt cement industry is a "significant contributor", the Administrator relied on a study conducted in 1967 which estimated that in 1967 total particulate emissions from the asphalt concrete industry amounted to 243,000 tons, and that the amount would increase to 403,000 tons in 1977 if the 1967 control level of ninety-five percent were maintained. By the time the Administrator made the designation and promulgated proposed standards, however, a large number of asphalt concrete plants had installed various control devices, especially in response to state and local regulations; according to NAPA, by 1973 virtually every asphalt concrete plant in the United States was equipped with a two stage collection system. NAPA estimates suggest that in 1972 total industry particulate emissions amounted to 40,000 tons; a figure nowhere near as high as the Administrator's estimate based on the 1967 study. Petitioners suggest that the Administrator failed to explain his reliance on the 1967 data, and that his "significant contributor" designation is therefore "arbitrary and capricious."

We see no merit in petitioners' argument. First, the Administrator never relied on the disputed study to estimate the level of *controlled* emissions; to the contrary, the Administrator specifically noted that *one* of the factors he considered was the rate of *uncontrolled* emissions. Moreover, the Administrator also stated that he was aware of and took into account the stringency of existing local and state limitations on emissions from asphalt concrete plants. The Administrator has thus determined that given the number of existing plants, the expected rate of growth in the number of plants, the rate of uncontrolled emissions,

and the level of emissions currently tolerated, *potential emissions* from new asphalt concrete plants would contribute "significantly" enough to warrant additional regulation to prevent deterioration of clean air. Petitioners have pointed to nothing in the record that indicates that the Administrator was arbitrary and capricious in reaching that determination.[7]

We also find a fundamental flaw in the contention that once an industry complies with regulations designed to *reduce* air pollution to the level established by national primary and secondary air quality standards, it is no longer a "significant contributor" subject to new source regulation. Compliance with existing regulations may well enable the states to achieve the national standards, but it does not mean that the Administrator is precluded from exercising regulatory authority to *prevent* deterioration of clean areas. Given the Administrator's statement that he examined current state and local emission limitations, we take his decision to be that construction of new plants subject only to current emission limitations would "significantly contribute" to future air pollution problems. For that reason he promulgated standards of performance that are more stringent than typical state and local regulations, and we can find no basis to upset that determination.

### III

We turn next to petitioners' contention that the Administrator acted in an arbitrary and capricious manner in promulgating the following standards of performance for new or modified asphalt concrete plants:

Standard for particulate matter

(a) On and after the date on which the performance test required to be conducted by § 60.8 is completed, no owner or operator subject to the provisions of this subpart shall discharge or cause the discharge into the atmosphere from any affected facility any gases which:

(1) Contain particulate matter in excess of 90 mg/dscm (0.04 gr/dscf).

(2) Exhibit 20 percent opacity, or greater. Where the presence of uncombined water is the only reason for failure to meet the requirements of this paragraph, such failure shall not be a violation of this section.

40 C.F.R. § 60.92.

Those standards were promulgated pursuant to section 111(a)(1) of the Act, which defines a standard of performance as "a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction) the Administrator determines has been adequately demonstrated." 42 U.S.C. § 1857c–6(a)(1) (1970). The components of that definition have been clarified in prior cases in this circuit reviewing standards of performance for other new source categories. We have indicated that "[i]t is the system which must be adequately demonstrated and the standard which must be achievable." *Essex Chemical Corporation v. Ruckelshaus*, 158 U.S.App.D.C. 360, 486 F.2d 427, 433 (1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974). "Adequately demonstrated" does not mean that existing asphalt concrete plants must be capable of meeting the standard; to the contrary, "[s]ection 111 looks toward what may fairly be projected for the regulated future, rather than the state of the art at present. . . ." *Portland*

---

**7.** Petitioners also challenge the validity of the 1967 study, cited by the Administrator, on the ground that its ranking of the asphalt concrete industry as one of the top twenty contributors to particulate matter pollution was at best an *estimate* based on such things as literature surveys and questionnaires. In the absence of specific empirical data, we see nothing to preclude the Administrator from relying on such estimates in making these legislative policy choices. Of course, the *reliability of the estimates* plays a role both in the Administrator's initial policy choice *and* in judicial review of the Administrator's decision. On this record, given the context in which the data was used, we are unable to say that the "significant contributor" designation was arbitrary or capricious.

*Cement Association v. Ruckelshaus, supra,* at 391. And an "achievable standard" is one "within the realm of the adequately demonstrated system's efficiency and which, while not at a level that is purely theoretical or experimental, need not necessarily be routinely achieved within the industry prior to its adoption." *Essex Chemical Corporation v. Ruckelshaus, supra,* at 433–34. Moreover, the system must be one "which can reasonably be expected to serve the interests of pollution control without becoming exorbitantly costly in an economic or environmental way." *Id.* at 433.

 The standard of review of actions of the Administrator in setting standards of performance is an appropriately deferential one, *see Ethyl Corporation v. EPA, supra,* 176 U.S.App.D.C. ——, 541 F.2d 34, and we are to affirm the action of the Administrator unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A) (1970). Since this is one of those "highly technical areas, where our understanding of the import of the evidence is attenuated, our readiness to review evidentiary support for decisions must be correspondingly restrained." *Ethyl Corporation v. EPA, supra,* at ——, 541 F.2d at 67 (Bazelon, C. J., concurring). "Our 'expertise' is not in setting standards for emission control, but in determining if the standards as set are the result of reasoned decision-making." *Essex Chemical Corporation v. Ruckelshaus, supra,* at 434.

The Administrator concluded, and petitioners concede, that the best system of emission reduction that has been adequately demonstrated for the asphalt concrete industry is represented by a venturi-scrubber with a twenty-inch pressure drop or a baghouse with an air-to-cloth ratio of six-to-one. Indeed, petitioner Warren Brothers informs us that those control technologies can be installed and operated at reasonable cost, and that various asphalt concrete companies are prepared to install those devices on plants that become subject to the final standards of performance.

 Petitioners do not accept, however, the finding of the Secretary that a well-maintained venturi-scrubber with a twenty-inch pressure drop or a well-maintained baghouse with an air-to-cloth ratio of six-to-one will keep emissions at or below 90 mg/dscm (.04 gr/dscf). According to petitioners, the EPA performed tests on only a handful of asphalt concrete plants; that in performing those tests the EPA departed substantially from its prescribed testing procedures; that the Administrator relied on various tests conducted by states and localities which also failed to conform to proper testing procedures; that the Administrator refused to consider the results of tests conducted by NAPA which indicated that the standard could not be achieved on a regular basis; that in interpreting the various tests results the Administrator completely overlooked or ignored a number of variables which should have been taken into account (including variations in the size, shape, and smoothness of particles in the feed aggregate, type of fuel, atmospheric conditions, and startup/shut down plant operations); and that the Administrator failed to show that guarantees issued by manufacturers of the relevant control devices supported the established mass emissions limitation.

We have considered these and other objections to the .04 gr/dscf standard promulgated by the Administrator, and, recognizing "the tempered review we exercise in these matters of non-judicial expertise," *Portland Cement Association v. Train,* 168 U.S.App.D.C. 248, 513 F.2d 506, 508 (after remand), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975), we cannot say that the Administrator's actions are either arbitrary or capricious. On the basis of our evaluation of the record evidence on these issues and the Administrator's responses thereto, we are unable to say that he did not engage in reasoned decision-making when he set the final performance standard at .04 gr/dscf rather than the originally proposed level of .031 gr/dscf.

We recognize that, for a variety of reasons, the Administrator conducted tests on

only four plants. But we think that the record evidence with respect to those tests, and tests conducted by others, including NAPA, preclude us from overturning the action of the Administrator. The four tests conducted by the Administrator had average emission levels of .007, .008, .018, and .031 gr/dscf, all below the final standard of .04 gr/dscf. Two of the tests conducted by NAPA also fell below the final standard; and EPA considered the results of the other two NAPA tests—which showed average emission levels of .043 and .108—but concluded that the plants were not well-controlled and should therefore not be used as a basis for determining standards for well-maintained new plants. In addition, the Administrator considered test results submitted by various local and state authorities, which ranged from .010 to .025 gr/dscf, as well as fifty-six other sets of test results submitted after publication of the proposed standards.

Some of these tests admittedly failed to comply strictly with prescribed testing procedures, but we do not think that the departures were substantial enough to warrant reversal. Moreover, we think the record undercuts petitioners' claim that the Administrator "ignored" or "completely overlooked" relevant factors such as particle size and shape; we think the Administrator's statements indicate an awareness of and a willingness to adjust for such factors. Given the record before us, we are simply unable to say that the Administrator acted in an arbitrary and capricious manner in promulgating the less stringent performance standard of .04 gr/dscf (rather than the proposed .031 gr/dscf) after the completion of the rulemaking proceeding. We therefore uphold the .04 gr/dscf mass emissions limitation.

Petitioners also challenge the second part of the final performance standards which makes it a violation to emit gases into the air exhibiting greater than twenty percent opacity. In this regard, we note that this court has recently upheld the use of a similar opacity performance standard for new portland cement plants. *Portland Cement Association v. Train, supra,* 513 F.2d 506. The court there noted that it was not warranted "on the basis of [the Administrator's] analysis to find that plume opacity is too unreliable to be used either as a measure of pollution or as an aid to controlling emissions," *id.* at 508, and nothing in the record in the case *sub judice* leads us to conclude otherwise. We have also considered petitioners' other attacks on the opacity standard, especially the issue of "achievability" in the context of asphalt concrete plants, and we conclude that we have no basis for rejecting the Administrator's conclusion that the twenty percent standard is valid.

Petitioners also challenge the final standards on the ground that the Administrator gave inadequate consideration to economic costs. We noted in *Essex Chemical Corporation v. Ruckelshaus, supra,* that "[i]t is not unlikely that industry and the EPA will disagree on the economic costs of these various control techniques" and that "[w]e have no desire or special ability to settle such a dispute." 486 F.2d at 437. In the case before us we have no difficulty in concluding that the Administrator gave adequate attention to the costs involved, especially in light of petitioner Warren Brothers' statement that the control technologies at issue "can be installed and operated at reasonable cost," Brief at 38, and that "petitioners are prepared to install the pollution control equipment the Administrator has determined to be the best demonstrated—and indeed have already largely done so." Brief at 65. The record evidence indicates that the Administrator gave consideration to the relevant cost factors, and we have no cause to disturb his judgment.

For all these reasons, the decision of the Administrator is affirmed.

*It is so ordered.*