United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 16, 1999 December 21, 1999 

 No. 98-1525

 Lignite Energy Council, et al., 
 Petitioners

 v.

 U.S. Environmental Protection Agency, 
 Respondent

 Natural Gas Supply Association, et al., 
 Intervenors

 Consolidated with 
 98-1529, 98-1533, 98-1541, 98-1543

 On Petitions for Review of an Order of the 
 Environmental Protection Agency

 F. Willam Brownell and William F. Pedersen argued the 
cause for petitioners. With them on the briefs were Craig S. 

Harrison, Jeffrey A. Knight, Harold P. Quinn, Jr., Gene E. 
Godley, Scott H. Segal, Brian R. Bjella, and Charles S. 
Miller, Jr.

 Heidi Heitkamp, Attorney General, State of North Dakota, 
and Carmen Miller, Assistant Attorney General, were on the 
brief for amicus curiae the State of North Dakota.

 Wendy L. Blake, Attorney, U.S. Department of Justice, 
argued the cause for respondent. With her on the brief was 
Lois J. Schiffer, Assistant Attorney General.

 Armond M. Cohen was on the brief for amicus curiae 
Conservation Law Foundation, et al.

 John H. Sharp, Michael R. Barr and Michael A. Conley 
were on the brief for intervenors.

 Before: Edwards, Chief Judge, Silberman and Henderson, 
Circuit Judges.

 Opinion for the Court filed Per Curiam.

 Per Curiam: Petitioners challenge EPA's new source per-
formance standards for nitrogen oxides emissions from utility 
and industrial boilers. We conclude that EPA did not exceed 
its discretion under section 111 of the Clean Air Act in 
promulgating these standards, and therefore deny the peti-
tions.

 * * * *

 Fossil-fuel fired steam generating units ("boilers") emit 
nitrogen oxides (NOx), air pollutants that can cause deleteri-
ous health effects and contribute to the formation of acid rain. 
Section 111 of the Clean Air Act requires EPA to establish 
performance standards for the emission of NOx from newly 
constructed boilers; these "new source performance stan-
dards" are to be set at a level that

 reflects the degree of emission limitation achievable 
 through the application of the best system of emission 
 
 reduction which (taking into account the cost of achieving 
 such reduction and any nonair quality health and envi-
 ronmental impact and energy requirements) the Admin-
 istrator determines has been adequately demonstrated.
 
42 U.S.C. s 7411(a)(1). In its 1990 Clean Air Act Amend-
ments Congress specifically directed EPA to exercise its 
section 111 authority and establish new NOx standards that 
incorporate "improvements in methods for the reduction of 
emissions of oxides of nitrogen." 42 U.S.C. s 7651f(c)(1).

 In response to these statutory mandates, EPA promulgated 
a rule lowering its NOx new source performance standards to 
.15 lb/MMBtu (pounds of NOx emitted per million BTU 
burned) for utility boilers1 and .20 lb/MMBtu for industrial 
boilers. See 63 Fed. Reg. 49,442, 49,443 (1998) (to be codified 
at 40 C.F.R. pt. 60). These standards reflect the level of NOx 
emissions achievable by what EPA considers to be the "best 
demonstrated system" of emissions reduction: the use of 
selective catalytic reduction (SCR) in combination with com-
bustion control technologies.2 Petitioners' central claim is 
that EPA selected SCR as the basis for its NOx standards 
without properly balancing the factors that section 111 re-
quires it to "take into account." Because section 111 does not 

__________
 1 To be precise, the emission standard for utility boilers is an 
output-based standard of 1.6 pounds of NOx emitted per megawatt-
hour of electricity generated. However, as this output-based stan-
dard was intended by EPA to correlate with a .15 lb/MMBtu input-
based standard, we refer to its input-based equivalent for simplici-
ty's sake throughout this opinion. We reject petitioners' argument 
that EPA's decision to shift to an output-based standard for utility 
boilers unfairly "penalizes" the use of low-energy coals, like lignite; 
it would seem just as easy to argue that an input-based standard 
"penalizes" high-energy fuels.

 2 SCR is a "flue gas treatment technology"; it reduces NOx 
after combustion by injecting ammonia into the flue gas in the 
presence of a catalyst, breaking down NOx and producing nitrogen 
and water. In setting past standards, EPA had focused solely on 
combustion control technologies, which instead reduce NOx by 
suppressing its formation during the combustion process. See 62 
Fed. Reg. 36,948, 36,949-50 (1997).

set forth the weight that be should assigned to each of these 
factors, we have granted the agency a great degree of discre-
tion in balancing them, see, e.g., New York v. Reilly, 969 F.2d 
1147, 1150 (D.C. Cir. 1992); EPA's choice will be sustained 
unless the environmental or economic costs of using the 
technology are exorbitant. See National Asphalt Pavement 
Ass'n v. Train, 539 F.2d 775, 786 (D.C. Cir. 1976).

 Petitioners argue that SCR is not the "best demonstrated 
system" under section 111 because the incremental cost of 
reducing NOx emissions is considerably higher with SCR than 
with combustion controls. Recent improvements in combus-
tion controls will enable many boilers to attain emissions 
levels close to EPA's SCR-based standards; accordingly, 
petitioners assert that EPA should have based its standards 
on these less expensive technologies. However, in light of 
EPA's unchallenged findings showing that the new standards 
will only modestly increase the cost of producing electricity in 
newly constructed boilers, see 62 Fed. Reg. 36,948, 36,958 
(1997) (proposed NOx revisions), we do not think that EPA 
exceeded its considerable discretion under section 111. 
Moreover, petitioners' argument stressing the comparable 
environmental merits of advanced combustion controls is to a 
certain extent self-defeating, since the new source perfor-
mance standards set by EPA are not technology-forcing, and 
continuing advances in combustion control technologies will 
reduce the amount of NOx reduction that must be captured by 
the more expensive SCR technology.

 It was also within EPA's discretion to issue uniform stan-
dards for all utility boilers, rather than adhering to its past 
practice of setting a range of standards based on boiler and 
fuel type. See, e.g., 44 Fed. Reg. 33,580 (1979) (establishing 
varying NOx emissions standards for utility boilers). Peti-
tioners recognize that EPA is not required by law to subcate-
gorize--section 111 merely states that "the Administrator 
may distinguish among classes, types, and sizes within cate-
gories of new sources," 42 U.S.C. s 7411(b)(2) (emphasis 
added)--but argue that it was arbitrary and capricious for 
EPA to decline to do so. EPA explains that its change to 
uniform standards is justified by SCR's performance charac-

teristics: Unlike the technologies on which past new source 
performance standards were based, flue gas treatment tech-
nologies like SCR limit NOx emissions after combustion, and 
the effectiveness of SCR is thus far less dependent upon 
boiler design or fuel type. Petitioners respond that there are 
reasons to expect SCR to perform less adequately on boilers 
burning high-sulfur coals, but EPA collected continuous emis-
sions monitoring data on two high-sulfur coal-fired utility 
boilers that showed that the .15 lb/MMBtu standard was 
achievable, and supplemented this study with similar evidence 
from foreign utility boilers. EPA also considered petitioners' 
concerns about the impact of alkaline metals on the perfor-
mance of the catalyst used in the SCR process, and concluded 
that such "catalyst poisoning" is not a significant problem in 
coal-fired boilers. See 63 Fed. Reg. at 49,445. Mindful of the 
high degree of deference we must show to EPA's scientific 
judgment, see, e.g., Appalachian Power Co. v. EPA, 135 F.3d 
791, 801-02 (D.C. Cir. 1998), we accept these determinations 
and sustain EPA's uniform standard for utility boilers.

 Petitioners offer a broader challenge to EPA's .20 lb/
MMBtu standard for industrial boilers, claiming that SCR is 
not "adequately demonstrated" for any coal-fired industrial 
boilers. EPA was unable to collect emissions data for the 
application of SCR to these boilers, but this absence of data is 
not surprising for a new technology like SCR, nor does it in 
and of itself defeat EPA's standard. Because it applies only 
to new sources, we have recognized that section 111 "looks 
toward what may fairly be projected for the regulated future, 
rather than the state of the art at present." Portland 
Cement Ass'n v. Ruckelshaus, 486 F.2d 375, 391 (D.C. Cir. 
1973). Of course, where data are unavailable, EPA may not 
base its determination that a technology is adequately demon-
strated or that a standard is achievable on mere speculation 
or conjecture, see, e.g., National Asphalt Pavement Ass'n, 
539 F.2d at 787, but EPA may compensate for a shortage of 
data through the use of other qualitative methods, including 
the reasonable extrapolation of a technology's performance in 
other industries. See, e.g., Weyerhaeuser Co. v. Costle, 590 
F.2d 1011, 1054 n.70 (D.C. Cir. 1978).

 EPA has done precisely that here, concluding from its 
study of utility boilers that SCR is "adequately demonstrat-
ed" and the .20 lb/MMBtu standard is "achievable" for coal-
fired industrial boilers as well. Utility and industrial boilers 
are similar in design and both categories of boilers can attain 
similar levels of NOx emissions reduction through combustion 
controls, which means that SCR will be required to capture 
comparable quantities of NOx for both boiler types. While 
petitioners argue that SCR is less likely to be effective on 
industrial boilers because they have widely fluctuating load 
cycles, EPA has shown that SCR can be successfully applied 
to coal-fired utility boilers under a "wide range of operating 
conditions" including those analogous to the load cycles of 
industrial boilers. 63 Fed. Reg. at 49,444. We think that it 
was reasonable for EPA to extrapolate from its studies of 
utility boilers in setting an SCR-based new source perfor-
mance standard for coal-fired industrial boilers.3

 We also sustain EPA's application of the .20 lb/MMBtu 
standard to combination boilers, which simultaneously com-
bust a mixture of fuels. The preexisting NOx emissions 
standards established a range of values for combustion boil-
ers that varied by fuel type: while combination boilers burn-
ing natural gas with non-coal solid fuels (e.g., wood) were 
subject to a .30 lb/MMBtu standard, the performance stan-
dards for combination boilers combusting coal with oil or 
natural gas were determined based upon the proportion of 
the boiler's total heat input provided by each fuel. See 51 
Fed. Reg. 42,768, 42,790 (1986). It is difficult to understand 
petitioners' objection to the application of the industrial boiler 
standard to boilers burning natural gas and wood. A reduc-
tion of that standard from .30 to .20 lb/MMBtu is perfectly 

__________
 3 For similar reasons, we do not think that EPA's lack of data 
on domestic SCR applications to boilers burning lignite renders its 
standards unlawful. In assessing a new technology like SCR, EPA 
is not required to provide evidence of its application to boilers 
burning every type of coal from every geographical location. It is 
acceptable for EPA to extrapolate from the successful applications 
of SCR to domestic high-sulfur coal-fired boilers and to foreign 
boilers burning lignite.

reasonable in light of the significant advances in NOx emis-
sions technology since 1986; indeed, EPA studies show that 
wood-fired boilers can reach emissions levels far lower than 
.20 lb/MMBtu through the application of flue gas treatment 
technologies. And our conclusion that the .20 lb/MMBtu 
standard is achievable for boilers burning only coal necessari-
ly defeats petitioners' objection that the industrial boiler 
standard is unreasonable as applied to combination boilers 
burning coal simultaneously with other fuels with lower NOx 
emissions characteristics.

 Petitioners' final objection is to EPA's valuation of steam 
energy produced by "cogeneration facilities." EPA's adop-
tion of an output-based standard for utility boilers raised the 
question of how to calculate the energy produced by these 
units, which generate thermal steam energy in addition to 
electrical energy. Steam energy produced by cogeneration 
facilities is exported for several different industrial uses; 
however, because of inefficiencies in transporting and con-
verting steam, only a fraction of steam energy produced by 
cogeneration facilities is actually used in the industrial pro-
cess. EPA resolved this problem by assigning a 50% credit 
for steam energy when determining a cogeneration unit's 
output. See 63 Fed. Reg. at 49,447. Petitioners describe this 
credit as an arbitrary and capricious "discounting" of steam 
energy's value, but it just as easily could be called a subsidy: 
The maximum efficiency for the conversion of steam to elec-
trical energy is only 38%, and EPA's final rule justifies the 
50% credit on the ground that it will encourage cogeneration. 
Id. In light of the difficulties that would attend calculating 
the useful energy of steam heat produced by cogeneration 
facilities on a unit-by-unit basis, we conclude that EPA's 
resolution of this issue was acceptable.

 The petitions for review are denied.

 So ordered.